| <u>Eric and José, Jr.</u> | | <u>José, Sr.</u> | | |
|---|---|---|---|---|
| $36,150.10 | + | $ 00.00 | = | **$36,150.10** |

IV.  Total:

$36,150.10 (lodestar) + $00.00 (0% upward adjustment) =       <u>**$36,150.10**</u>

**Doris A. CURRIE, Plaintiff,**

v.

**Marvin M. KOWALEWSKI, d/b/a Unitec, Defendant.**

**No. 91–CV–367.**

United States District Court,
N.D. New York.

Jan. 7, 1993.

**32**

Leon R. Koziol, Utica, NY, for plaintiff.

Smith, Sovik, Kendrick, Schwarzer & Sugnet, P.C., James D. Lantier, Syracuse, NY, for defendant.

## MEMORANDUM—DECISION AND ORDER

HURD, United States Magistrate Judge.

### I. *Introduction.*

The plaintiff, Doris A. Currie, filed her complaint in this action on April 2, 1991, pursuant to Title VII, 42 U.S.C. 2000e & c, alleging that the defendant, Marvin M. Kowalewski, sexually harassed her during the course of her employment at Unitec. In his answer filed on April 25, 1991, the defendant denied the material allegations in plaintiff's complaint.

The Court conducted a two day nonjury trial on June 15 and 16, 1992, in Utica, New York. Although the proceedings were recorded by electronic sound recording, a transcript has not been prepared for use by the Court. The Court has relied upon its notes and the submissions of the parties in preparing this decision. The plaintiff was the only witness called on her own behalf. Defendant and two employees of his company testified for the defendant.

The following is the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### II. *Facts.*

In 1989, the plaintiff was employed by the Cintron Nursing Home, Upper Tilden Avenue, Utica, New York, as a nurses' aid. At that time, the defendant was the sole owner and operator of a company known as Unitec, located at 34 Main Street, Whitesboro, New York. The company employed approximately ten persons, and manufactured and assembled electronic score keeping equipment for sporting events.

The defendant started Unitec in 1978. He was formerly an assistant professor at Kirkland College from 1974 to 1978. He has a Ph.D. from Kent State University. The company was originally located in the basement of his home, and it grew until it moved to its present location in 1984. It now has thirteen employees. In 1989, it had twenty-two to twenty-four employees.

In July 1989, the plaintiff was hired by the defendant to supervise five assembly line employees. She had no prior supervisory experience, although she did have a high school diploma. Plaintiff was hired following a two week trial period. She started at $6.00 per hour and received raises to $6.30 per hour on August 31, 1989; $7.00 per hour on November 6, 1989; and $7.50 per hour on June 25, 1990.

Defendant testified that he hired the plaintiff because she came to him with a very good recommendation. He admits he gave her three raises during the course of her employment, despite the fact that she was having some problems with her job. His target was to get her up to $8.00 per hour as soon as possible.

It is the plaintiff's contention that starting in August 1989, and continuing intermittently until August 1990, she was subjected to various acts of sexual harassment

by the defendant which finally caused her to quit her job. Plaintiff then filed a complaint with the Equal Employment Opportunity Commission (EEOC) on or about September 24, 1990, and after the passage of 180 days without action, plaintiff requested and received a right to sue letter.

At the trial, the plaintiff testified to the following events that occurred during that one year period.

In August 1989, during the course of a silk screening operation, there was some casual banter between the defendant and other female employees about having his baby. He directly asked employees Jesse Piasecki and Helina Malinowski whether they would have his baby. He told them that he wanted to have a son. He also asked the plaintiff if she would have his baby. In response, she replied that she did not feel that these comments were appropriate. Approximately one month later there was a second similar type of conversation in the presence of other employees about having his baby, and she again told him that she did not appreciate this type of joking. These were the only two occasions when there was talk about having his baby. There was some other conversation about a "Unitec baby" born to Jesse Piasecki.

Approximately a month after she started working for him, the defendant began to have physical contact with her, which she described as "full body hugs." Most of the time these hugs were in the presence of other employees. Each time she would push him off and tell him to keep his hands off of her. He would explain that he did not mean anything by it, and that he was old enough to be her father. She testified that she received twenty to thirty of these full body hugs during the course of the year she worked for the defendant. Piasecki and Malinowski were present during most of these physical encounters. She reprimanded the defendant on each occasion.

On yet another occasion, in the presence of other employees, when she asked him if he needed anything else, he replied, "Yes, sex." She took this remark seriously and not as a joke.

On July 17, 1990, in private, he came up to her and said, "Isn't it a great day out? It's a great day to have sex." Again, she advised him that she didn't appreciate that type of conversation, and that it bothered her.

On another occasion, the plaintiff claimed she was bending over in the spray room, and the defendant came up behind her with a can of spray. When she turned around, defendant said he was going to "Spray her in the ass."

At one time, Jesse Piasecki asked plaintiff if she and the defendant were lovers. On a few occasions defendant invited her out to lunch or to go on automobile rides with him, but she rejected the offers.

During the course of her employment at Unitec, plaintiff never called for help or complained to any of the other employees about any acts of the defendant. Although plaintiff alleged in her complaint that defendant touched her "breasts and private parts," she testified at trial that she was never touched on the breasts or buttocks, and that the defendant never tried to kiss her. The plaintiff has no recollection of defendant putting his hands on her shoulders or arms to console her after she made a mistake. She did testify that on one occasion she did make a very serious mistake and she felt that she might be fired. When he did not fire her, but consoled her with a full body hug, she again reprimanded him and told him to keep his hands off of her.

Events came to a climax in early August 1990. On Friday, August 3, he put his arm around her and she said, "Don't put your hands on me." This was not a full body hug, but he had his arms around her shoulders. On Monday, August 6, she was working in her good clothes when they became dirty. Again, he went to touch her and she said, "Don't put your hands on me," and she proceeded to walk off the job and did not return after the noon hour break.

That afternoon, she had a telephone conference with him in which he attempted to entice her to come back to work, but she

refused. A few days later she received a letter from the defendant (Exhibit "3"), in which he expressed sorrow and shock that she was leaving. He also set forth in detail his versions of the events starting on Wednesday, August 1, through Tuesday, August 7. He denied touching the plaintiff on Monday, August 6.

He admitted he touched the plaintiff five or six times, but denies ever giving her a full body hug. He said that when he did touch her shoulder or arm it was either jokingly or to console her after she made mistakes because she was having a difficult time learning the supervisory job. He denies ever having any discussions about having his baby with the plaintiff or anyone else. He denies any off color jokes. He also denies any conversations about sex with the plaintiff. He testified that the plaintiff never accused him of touching her, nor did she reprimand him or push him away. He denies the spray can incident. He did admit that when he saw the plaintiff on August 6, 1990, she was rather dirty and he became concerned that she was getting her good clothes soiled doing a job to which a fellow employee was assigned, that he reached for her, and she did say, "Don't touch me." He told her that he was sorry. He also testified that shortly before she quit, he had one private discussion with her in which she requested that he no longer even touch her on the shoulder in front of the other employees because they believed she was a favored person. Despite the fact that she had some serious problems in her job, and on one occasion she made some false entries regarding the time she reported to work, there was never any bad performance reports in her personnel file.

Jesse Piasecki testified for the defendant. She is an assembler at Unitec, and has been working there for five years. She was one of the employees that was under plaintiff's supervision. Piasecki had complained to the defendant about the plaintiff making erroneous entries in the time sheets regarding the times she reported to work. She was the first one at the company to have a baby, and this was generally referred to as the "Unitec baby." She denies ever seeing the defendant give the plaintiff a full body hug. She testified that plaintiff never made any complaints to her about the defendant touching her. She further denied ever asking the plaintiff whether or not he and the defendant were lovers. She said that the defendant would occasionally put his hand on her arm or shoulder in a kidding and affectionate manner, or when she was having some problems with the job, but that she never took offense. She denies that defendant even jokingly asked her to have a baby by him, and that she never heard him make such a remark to the plaintiff. On a few occasions, she did see the defendant touch the plaintiff on the shoulder in the same affectionate, joking, and consoling manner that he touched her. She testified that the two women who worked in the plaintiff's position prior to plaintiff both quit. The defendant testified that both women still lived in the Utica area. Neither woman was called to testify at the trial.

Helina Malinowski also testified for the defendant. She has been employed by the defendant as an assembler and silk screener for five years. She also denies ever seeing any full body hugs between the plaintiff and defendant. She also denies any baby talk or lover's conversation. She said the plaintiff never made any complaints to her about any activity of the defendant.

### III. *Conclusions.*

The standard to review a sexual harassment case such as this are clearly set forth in the Second Circuit case of *Carrero v. New York City Housing Authority*, 890 F.2d 569, 577 (2d Cir.1989):

Title VII forbids employers from discriminating 'against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....' 42 U.S.C. § 2000e–2(a)(1).

[One type of] sexual harassment, called hostile environment, occurs when an employer's conduct ' "has the purpose or effect of unreasonably interfering with an individual's work performance or cre-

ating an intimidating, hostile, or offensive working environment." ' *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (quoting 29 C.F.R. § 1604.11(a)(3) (1985)).

To prevail on a hostile environment claim under Title VII the complaining employee must prove that the harassment is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405 (*quoting Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)). The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. *See Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987). Whether the sexual harassment constitutes a Title VII violation is determined from the totality of the circumstances. *See Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986) (racial harassment); *Henson*, 682 F.2d at 904. *Accord* 29 C.F.R. § 1604.11(b) (1988).

*Danna v. New York Telephone Co.*, 752 F.Supp. 594, 609–610 (S.D.N.Y.1990) states:

To establish a claim for hostile environment, a plaintiff must prove:

(a) The employee belongs to a protected class;

(b) The employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature;

(c) The harassment complained of was based upon sex;

(d) The harassment complained of affected a term, condition or privilege of employment; and

(e) Respondeat superior.

*Henson*, 682 F.2d at 909; *Koster v. Chase Manhattan Bank*, 687 F.Supp. 848, 862 (S.D.N.Y.1988).

■ The plaintiff, therefore, has the burden of proving by a fair preponderance of the evidence that the alleged sexual harassment actually occurred; that it was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive work environment; and that the advances were unwelcome. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 62 (2d Cir.1992). In determining whether a plaintiff has established a hostile environment claim, "[a] court should consider the offensiveness of the defendant's conduct, its pervasiveness, and its continuous nature," *Id*, evaluated in light of all the circumstances surrounding the conduct. Finally, in order to establish a violation of Title VII, defendant's conduct must be offensive to a reasonable person who is faced with comparable working conditions. *Babcock v. Frank*, 783 F.Supp. 800, 808 (S.D.N.Y.1992).

■ Assuming the plaintiff's testimony to be true, the work environment appears to be a situation of some casual discussion among some employees about "having a baby", some sexual references and full body hugs on many occasions. It is important to note that almost all of the above took place in the presence of others and were not private acts between two individuals. Although these activities were inappropriate they do not rise to the point of being sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. This is not a case where the plaintiff was required to "run a gauntlet of sexual abuse in return for the privilege of being allowed to work in making a living." *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405 (*quoting Henson*, 682 F.2d at 902).

Again accepting all of the testimony of the plaintiff as true, the plaintiff has not submitted any prior cases of such a similar fact pattern that would justify a recovery in this case. The plaintiff has cited four cases which she contends involved a "variety of circumstances less intrusive or hostile than those involved in this case." However, a review of the four cases reveals acts by an employer far more abusive than what was committed against the plaintiff.

In *Brooms v. Regal Tube Co.*, 881 F.2d 412 (7th Cir.1989), the plaintiff's supervisor

**36**

made numerous explicit racial and sexual remarks.[1] He also directly propositioned plaintiff. *Brooms*, 881 F.2d at 416. Neither element is present in this case.

In *Hall v. Gus Constr. Co.*, 842 F.2d 1010 (8th Cir.1988), the three women plaintiffs were subjected to flagrant verbal sexual abuse, repeated propositions, offensive, unwelcome and forcible touching of their thighs and breasts, "mooning", flashing of obscene pictures, and other extremely offensive behavior. *Hall*, 842 F.2d at 1012. The alleged acts in this case are not nearly as abusive or offensive.

In *Bennett v. Corroon and Black Corp.*, 845 F.2d 104 (5th Cir.1988), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989), the plaintiff was depicted in cartoons, displayed in the men's room, engaging in crude and deviate sexual activity. Management had notice of the cartoons, and the chief executive officer even saw them, but failed to remove the cartoons. *Bennett*, 845 F.2d at 105. Again, the present case presents no evidence of any such explicit sexual harassment.

In *Jones v. Wesco Inv., Inc.*, 846 F.2d 1154 (8th Cir.1988), the plaintiff was barraged with repeated sexual advances, requests for sexual favors, and other verbal and physical contact of a sexual nature. The president of the company touched her breasts, kissed her on the lips, and made statements like, "Your breasts will be mine." *Jones*, 846 F.2d at 1155. The acts were in private with no witnesses. In the instant case, almost all of the acts alleged by the plaintiff were in the presence of others.

These facts, coupled with the testimony of the defendant and two other witnesses, that the "baby talk", "sex talk", and "full body hugs" never occurred, convinces this court that the plaintiff has failed to meet her burden of proof. Plaintiff was not subjected to behavior that would adversely affect a reasonable person. In addition, a reasonable person in plaintiff's position would not have found the conditions at Unitec to be offensive or repulsive. Finally, although plaintiff's working conditions were allegedly altered by defendant's conduct, i.e., she resigned, plaintiff failed to demonstrate that she was constructively discharged. The working conditions were not " 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983) (*quoting Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)). Therefore, the complaint must be dismissed.

In reaching its ruling, the court is not relying on the cases of *Scott v. Sears Roebuck & Company*, 798 F.2d 210 (7th Cir. 1986); *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307 (5th Cir.1987); or *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991), which were cited by the defendant. Those cases all involve acts of harassment and abuse far more severe than anything alleged by the plaintiff in this case, and yet plaintiffs in those cases did not prevail. In addition, the cited cases were from other circuits and this court would have declined to follow same if presented with similar fact situations.

Inasmuch as the court finds that the complaint was not "frivolous, unreasonable, or without foundation," but apparently was based upon the plaintiff's mistaken belief that defendant's acts amounted to sexual harassment, the defendant is not entitled to attorney's fees or expenses. *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 422, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978); *Greenberg v. Hilton Int'l Co.*, 870 F.2d 926, 939–940 (2d Cir. 1989).

Therefore, it is

ORDERED, that the complaint be and the same is hereby dismissed; and it is further

---

1. On one occasion, plaintiff's supervisor showed plaintiff "a pornographic photograph depicting an interracial act of sodomy and told her that the photograph showed the 'talent' of a black women." *Brooms*, 881 F.2d at 417. On another occasion, he showed plaintiff a racist pornographic photograph involving bestiality and said that this was how she "was going to end up." *Id.*

ORDERED, that the Clerk of the court enter judgment dismissing the complaint on the merits;  and it is further

ORDERED, that the Clerk serve a copy of this Order upon the parties to this action.

IT IS SO ORDERED.