**Doris A. CURRIE, Plaintiff,**

v.

**Marvin M. KOWALEWSKI, d/b/a Unitec, Defendant.**

**No. 91–CV–367.**

United States District Court, N.D. New York.

Jan. 28, 1994.

58

Leon R. Koziol, Utica, NY, for plaintiff.

Smith, Sovik, Kendrick, Schwarzer & Sugnet, P.C., Syracuse, NY (James D. Lantier, of counsel), for defendant.

## MEMORANDUM–DECISION and ORDER

HURD, United States Magistrate Judge.

### I. Introduction.

The plaintiff, Doris A. Currie, filed her complaint in this action on April 2, 1991, pursuant to Title VII, 42 U.S.C. 2000e & c, alleging that the defendant, Marvin M. Kowalewski, sexually harassed her during the course of her employment at Unitec. In his answer filed on April 25, 1991, the defendant denied the material allegations in plaintiff's complaint.

Following a two day nonjury trial, the plaintiff's complaint was dismissed, *Currie v. Kowalewski*, 810 F.Supp. 31 (N.D.N.Y.1993), upon a holding that even accepting her testimony to be true, it did not create an abusive work environment. *Id.* at 35; *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). On appeal, the Second Circuit disagreed, vacated the judgment of dismissal, and remanded for further proceedings. *Currie v. Kowa-*

*lewski*, 14 F.3d 590 (2d Cir.1993). The parties have submitted post appeal memoranda.

The following are the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### II. FINDINGS OF FACT.

At the trial, plaintiff was the sole witness in her own behalf. Defendant and two of his employees, Czeslawa "Jesse" Piasecki and Helina Malinowski testified for the defense.

In 1989, the plaintiff was employed by the Sitrin Nursing Home, Upper Tilden Avenue, New Hartford, New York, as a nurses' aide. (T. 16)[1] The defendant was the sole owner and operator of a company known as Unitec, located at 34 Main Street, Whitesboro, New York. The company presently manufactures and assembles electronic score keeping equipment for sporting events.

The defendant, who has a Ph.D. from Kent State University, started Unitec about 1967 in Ohio, originally for the production of both fencing equipment and learning devices for school children. (T. 168) After moving to New York, he was an assistant professor at Kirkland College, Hamilton, New York, from 1974 to 1978; during which time he ran Unitec on a part-time basis. (*Id.*) Defendant then turned his full attention to Unitec after Kirkland College was closed in 1978. (T. 169–70) The company at that time was located in the basement of his home. As the business grew it moved to its present location in 1984. In 1989–90, Unitec employed thirteen people.

In July 1989, the plaintiff was hired by the defendant to supervise five assembly line employees. (T. 23) She had no prior supervisory experience, although she did have a high school diploma, and some technical training in machine operation, and had worked as a laborer for the Bendix Corporation. (T. 86, 88–89) Plaintiff was hired following a two week trial period in which she worked at Unitec for approximately one hour per day in order to acclimate herself to the business and vice versa. (T. 41, 84–85, 176) She started at $6.00 per hour and received raises to $6.50

---

**1.** "T" refers to the relevant page(s) of the Trial Transcript.

per hour on August 31, 1989; $7.00 per hour on November 6, 1989; and $7.50 per hour on June 25, 1990. (T. 43, 46–47)

Defendant hired the plaintiff because she came to him with a very good recommendation. (T. 175) He gave her the three raises during the course of her employment, despite the fact that she was having some problems with her job. His target was to get her up to $8.00 per hour as soon as possible. (T. 177)

It is the plaintiff's contention that starting in August 1989, she was subjected to various acts of sexual harassment by the defendant which finally caused her to quit her job on August 6, 1990. She filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on or about September 24, 1990, and, after the passage of 180 days without action, plaintiff requested and received a "right to sue" letter. The defendant denies any acts of sexual harassment or the creation of a hostile work environment.

In August 1989, during the course of a silkscreening operation, there was some casual banter between the defendant and other female employees about having his baby. (T. 24) He directly asked employees Jesse Piasecki and Helina Malinowski whether they would have his baby. (T. 94) He told them that he wanted to have a son. (Id.) He also asked the plaintiff if she would have his baby. In response, she replied that she did not appreciate these comments or suggestions; although she thought at first he was joking with the other employees whom he knew well. (T. 24–26) Approximately one month later there was a second similar type of conversation in the presence of other employees about having his baby, and plaintiff again told him that she did not appreciate this type of humor. (T. 26) These were the only two occasions when there was talk about having his baby, although there were other conversation about a "Unitec baby" born to Jesse Piasecki. (T. 275–76)

Several weeks later, defendant began to have physical contacts with plaintiff which she described as "full body hugs." (T. 28–29) These were face-to-face embraces which were mostly in the presence of other employees.[2] Each time she would push him off and tell him to keep his hands off of her. (T. 29, 120) He would explain that he did not mean anything by it, or that he was old enough to be her father. (T. 121) She received twenty to thirty of these "full body hugs" during the course of the year she worked for the defendant. (T. 119) She reprimanded the defendant on each occasion; once she even threatened to break his bones if he did it again. (T. 31) On another occasion he came up behind plaintiff and ran an object up the side of her "butt". (T. 30, 122) She told him, "[Y]ou keep your stinking hands off me." (T. 30) Again he told her she had nothing to worry about because he was old enough to be her father. (Id.) On one other occasion, in the presence of other employees, when she asked him if he needed anything else upon completion of an assignment, he replied, "Yes, sex." (T. 33) She took this remark seriously and not as a joke. (T. 34) On July 17, 1990, in private, he came up to her and said, "It's a beautiful day to have sex, isn't it?" (T. 48) Plaintiff walked out of the room.

On still another occasion, plaintiff was bending over in the spray room,[3] and the defendant came up behind her with a can of spray paint. When she turned around, defendant said he was "Going to spray you in the butt, but I knew you'd knock me out." (T. 31) Plaintiff said he was "absolutely right." (Id.) At one time, Jesse Piasecki asked plaintiff if she and the defendant were lovers. (T. 77) On a few occasions defendant invited her out to lunch or to go on boat rides with him. (T. 34) She did go to lunch with him twice at a nearby diner, but with other people. She refused the boat ride invitations.

In July 1990, plaintiff discussed these events with defendant, and told him such acts would no longer be tolerated. (T. 35–36) He replied by saying he only did those things

---

**2.** Plaintiff testified that over 50% of these "full body hugs" were either in front of other employees or in an area of the plant where all could see if they so chose. (T. 119)

**3.** The spray room is a 12 foot area of the shop floor where face plates are touched up with spray paint. (T. 188)

because he knew it bothered her. (T. 37) She also explained that his activities violated her religion and moral ethics as a Jehovah's Witness. (T. 37–38) Despite this conversation, defendant continued to make unwelcome advances and repeatedly embraced the plaintiff,[4] although there were never any work-related promises made for the exchange of sexual favors. (T. 131–32)

Because of defendant's unwelcome embraces, touchings, advances and sexual innuendoes, plaintiff lost the respect of her subordinates. (T. 40) This resulted in a deterioration of her work performance and ability to delegate work to other employees. (T. 182) In fact, the other employees made complaints about her to the defendant. (T. 63–64, 195–96)

The defendant denies that the above events took place. He did admit that on five or six occasions he innocently touched her shoulder or arm (T. 180–81), but he claims she never complained until a few weeks prior to quitting when she told him to stop touching her even on the shoulder because it looked bad in front of the employees she was required to supervise. (T. 182) Despite the fact that she had some serious problems in her job, made many mistakes (at least one very substantial one (T. 65)), and on one occasion even made some false entries regarding the time she reported to work (T. 15–16, 192–94), there were never any bad performance reports in her personnel file, and she continued to receive raises. (T. 47–48) The defendant's two employees, Piasecki and Malinowski, also testified that they never saw any full body hugs or other improper behavior on the part of the defendant.[5] (T. 277–78; 292–93, 299)

In reviewing the testimony, the demeanor of the parties, the general attitude of the defendant, and the fact that his two witnesses were past or present employees of the defendant and under his control, the court accepts the plaintiff's version of the events as described above. These events did take place, as described by the plaintiff in detail, with exceptions as noted below.

In contrast to her specific testimony about numerous other advances of the defendant, the plaintiff testified vaguely and briefly with regard to her claims of more intimate and offensive contacts by the defendant. In response to one question, she stated, "What happened in private was he touched private parts that—he had touched my breasts, he had touched my butt. He had reached for my crotch." (T. 32) When asked to describe the frequency of such contact, she responded, "I can honestly say that if I was there and he was there, something was said or done of a sexual nature." (T. 33) That was the extent of her testimony in that regard, although her direct testimony consumed fifty-five pages of transcript. Other than the fact that such contacts occurred in private, the plaintiff's attorney made no attempt to elaborate regarding the approximate number of times such contacts occurred; where such contacts occurred; what, if anything, defendant said to the plaintiff at the time of such contacts; what, if anything she said to him in response to such contacts; whether she slapped his hands, moved him away, or retreated herself after such contacts; or whether she complained to anyone about such contacts immediately thereafter.

This testimony was in regard to the most egregious acts of defendant alleged by plaintiff, but she completely failed to give any particulars. As noted above, this is in contrast to the rest of her testimony when she went into considerable detail. The portion of plaintiff's testimony regarding "touching and reaching" was so inconsequential that the defense asked no questions on cross-examination; and the defendant was not asked on direct examination whether he ever touched her breasts or reached for her crotch. He did deny touching her buttocks. (T. 187) On cross, he also denied touching her breasts. (T. 252) If these contacts actually occurred, an experienced attorney would

---

4. In fact, the very next day, defendant twice approached her while she was on the phone and put his arm around her. (T. 38–39) Plaintiff testified that there were four or five such instances over the course of her employment. (T. 124)

5. Piasecki did testify that she saw defendant touch plaintiff on the shoulder when he was reassuring plaintiff after a mistake was made. (T. 288)

have brought these events strongly to the forefront with a series of follow-up questions sufficient to demonstrate that there was some foundation for the testimony, and not merely a figment of the plaintiff's imagination or an attempt to bolster her case. This plaintiff's counsel completely failed to do. Therefore, the only logical conclusion is that such acts and contacts never actually took place.

Shortly before she quit, the parties had a discussion in which she requested that he no longer even touch her on the shoulder in front of the other employees because they believed she was a favored employee. (T. 35–38, 182–83) Events came to a climax in early August 1990. On Friday, August 3, defendant put his arm around plaintiff and she said, "Don't put your hands on me." (T. 38–39) This was not a full body hug, but he had his arms around her shoulders. On Monday, August 6, she was working in her good clothes when they became dirty. Again, he went to hug her and she said, "Don't put your hands on me," and she proceeded to walk off the job and did not return after the noon hour break. (T. 50–51) The defendant testified that when he saw the plaintiff on August 6, 1990, she was rather dirty and he became concerned that she was getting her good clothes soiled doing a job to which a fellow employee was assigned; that he reached for her, and she pulled away. (T. 197–98) He told her that he was sorry. (*Id.*)

A few days after she left Unitec, she received a letter from the defendant (Exhibit "3"), in which he expressed sorrow and shock that she was leaving. He also set forth in detail his versions of the events beginning on Wednesday, August 1, through Tuesday, August 7. (T. 54, 56) He denied touching the plaintiff on Monday, August 6. (T. 198) He asked for a reply from her but she refused to comment on the letter itself for fear that by doing so she was agreeing to his version of the accounts contained therein. (T. 56) Plaintiff did have a telephone conference with defendant in which he attempted to entice her to come back to work, but she refused. (T. 52) When plaintiff quit, defendant did not contest her unemployment application. (T. 53–54)

The incidents testified to by the plaintiff are accepted and the defendant's denials rejected, except as to the touching of her breasts, butt, or reaching for her crotch. The question thus becomes—was this sexual harassment?

## III. CONCLUSIONS OF LAW.

As an initial matter, plaintiff testified that she was not denied any work-related benefits because she refused the sexual advances of her employer, i.e., "quid pro quo" sexual harassment. Therefore, in order to recover under Title VII, plaintiff must prove that defendant created a hostile or abusive work environment. *Kotcher v. Rosa and Sullivan Appliance Center, Inc.,* 957 F.2d 59, 62 (2d Cir.1992).

The recent Supreme Court case of *Harris v. Forklift Systems, Inc.,* — U.S. ——, ——, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) has re-affirmed the standard for review in sexual harassment cases such as this.

> Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).... When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," 477 U.S., at 65, 106 S.Ct., at 2405, that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *id.,* at 67, 106 S.Ct., at 2405 (internal brackets and quotation marks omitted), Title VII is violated.

> . . . . .

> A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible

effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

. . . . .

[W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Even before *Harris,* the standard of review in a sexual harassment case such as this was clearly set forth in *Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989):

Title VII forbids employers from discriminating 'against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....' 42 U.S.C. § 2000e–2(a)(1). [One type of] sexual harassment, called hostile environment, occurs when an employer's conduct ' "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." ' *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404 (quoting 29 C.F.R. § 1604.11(a)(3) (1985)).

To prevail on a hostile environment claim under Title VII the complaining employee must prove that the harassment is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.' " *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). The incidents must be more than episodic;

they must be sufficiently continuous and concerted in order to be deemed pervasive. *See Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2d Cir.1987). Whether the sexual harassment constitutes a Title VII violation is determined from the totality of the circumstances. *See Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986) (racial harassment); *Henson,* 682 F.2d at 904. *Accord* 29 C.F.R. § 1604.11(b) (1988).

The plaintiff has the burden of proving by a fair preponderance of the evidence that the alleged sexual harassment actually occurred, i.e., "that she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for favors or other verbal or physical conduct of a sexual nature ...", *Locastro v. East Syracuse–Minoa Cent. School Dist.,* 830 F.Supp. 133, 137 (N.D.N.Y. 1993) (citations omitted); that the harassing conduct was sufficiently severe or pervasive so as to alter the terms or conditions of employment and create an abusive work environment; and that the advances were unwelcome. *Kotcher,* 957 F.2d at 62. In determining whether a plaintiff has established a hostile environment claim, "[a] court should consider the offensiveness of the defendant's conduct, its pervasiveness, and its continuous nature," *Id.,* evaluated in light of all the circumstances surrounding the conduct. Finally, in order to establish a violation of Title VII, defendant's conduct must be offensive to a reasonable person who is faced with comparable working conditions. *Babcock v. Frank,* 783 F.Supp. 800, 808 (S.D.N.Y.1992).

■ Even discounting plaintiff's testimony that defendant touched her breasts and buttocks, and reached for her crotch, the totality of circumstances demonstrate that defendant created a hostile work environment. The continuation of frontal full body hugs after being told to stop over a period of eleven months is completely unacceptable in an employee/employer relationship. This, coupled with the other incidents of sexual innuendos, sexual advances, sexual talk, and admitted unwelcome touching, illustrates the inappropriate behavior of the defendant. As a result, this caused plaintiff's subordinates to

resent her supervisory role and created very difficult working conditions for her.

Moreover, despite episodes of poor performance (including dishonesty and false reporting) on the job, the plaintiff received raises and favors because defendant wished to continue to touch and bother her. Furthermore, defendant did not challenge plaintiff's unemployment application in order to avoid a public hearing; a hearing which would no doubt reveal the real reason she quit. This is further proof that acts of sexual harassment by the defendant actually occurred. The acts and advances were unwelcome and created an environment that was hostile to the plaintiff because of her sex. As a result, the plaintiff has met her burden of proving that she perceived the environment created by defendant to be abusive and she was subjected to behavior that would adversely affect a reasonable person.

Although the *Harris* case did not explicitly decide whether a reasonable person or reasonable woman (or victim) standard applies, certainly any reasonable woman or person would have found the defendant's behavior to be offensive and repulsive. When the defendant refused to stop touching her after repeatedly being admonished to do so, he created a work environment that was "so difficult [and] unpleasant that a reasonable person in [plaintiff's] shoes would have felt compelled to resign." *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (*quoting Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)); *Lopez,* 831 F.2d at 1188. There is also no question that plaintiff herself perceived the environment at Unitec to be hostile and abusive, and that due to such conditions, her employment with the defendant was adversely altered. Plaintiff never welcomed such conduct on behalf of the defendant, and in fact, each time defendant did embrace plaintiff she told him to stop. (T. 120) These events often occurred in the presence of plaintiff's subordinates which caused her to lose respect and control. This, in turn, made it impossible to carry out her employment duties. Under the circumstances, she was justified in quitting. The plaintiff is entitled to damages.

## IV. DAMAGES.

 As an initial matter, the plaintiff is, of course, required to mitigate her damages. *Clarke v. Frank,* 960 F.2d 1146, 1152 (2d Cir.1992). The burden of proof in appropriate cases is on the defendant to prove that the plaintiff failed to mitigate his or her damages. *See Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1258 (2d Cir.1987). Here, however, plaintiff has successfully shown that she mitigated her damages. She did so by actively seeking training immediately after leaving defendant's employ, accepting unemployment benefits, and becoming employed within six months after leaving the defendant's employ.

The plaintiff was out of work from August 1990, to February 1991 (T. 60–61), and during that time received $3,161.00 in unemployment compensation. In February 1991, she started work as a free lance interpreter for the Resource Center for Independent Living in Utica. (T. 61) From February 1991 to December 1991, she earned approximately $3,800.00 in that job. On November 1, 1991, she started work as an educational sign language interpreter for the Beechwood Schools in Beechwood, Ohio.[6] There is no proof that she was, or is, earning less in that position than if she had continued to be employed at Unitec. Therefore, the period of back pay is from August 6, 1990, to November 1, 1991. The total unemployment compensation and earnings received by the plaintiff for that period was $6,961.00.

If the plaintiff had continued to work at Unitec where she was earning $7.50 per hour on August 6, 1990, she could have anticipated earning $8.00 per hour as of January 1, 1991. On the basis of a forty hour work week, she would have earned $300.00 per week in 1990, and $320.00 per week in 1991. Therefore, in 1990—twenty-one weeks[7] at $300.00 per

---

6. Plaintiff testified that, although she began her job in Ohio on November 1, 1991, she continued to do free lance work for the Resource Center for Independent Living in Utica until December 1991. (T. 62)

7. August 6, 1990 to December 31, 1990.

**64**

week equal earnings of $6,300.00; in 1991—forty-four weeks [8] at $320.00 per week equal earnings of $14,080.00; and her total earnings from August 6, 1990 to November 1, 1991, would have been $20,380.00.

The back pay would be the difference between the amount of money she actually received from unemployment and salary ($6,961.00), and the pay she would have received if she had not been forced to quit her employment at Unitec ($20,380.00). Plaintiff lost the sum of $13,419.00. In addition, the court will also award prejudgment interest to this date compounded yearly in the sum of $3,011.03.[9] *See Reichman v. Bonsignore, Brignati & Mazzotta P.C.,* 818 F.2d 278, 281 (2d Cir.1987); *see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 145 (2d Cir. 1993). The total monetary damage to the plaintiff is the sum of $16,430.03.

The plaintiff has not requested reinstatement.

Therefore, it is

ORDERED that

1. Plaintiff is awarded the sum of $16,430.03 against the defendant; and

2. Plaintiff may file an application for attorney's fees and expenses within fourteen (14) days; defendant may file his opposition, if any, to plaintiff's application, within fourteen (14) days thereafter.

The clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

---

8. January 1, 1991 to November 1, 1991.

9. Prejudgment interest has been determined by annual rates of 11% in both 1990 and 1991. These rates are based on the federal short-term rate pursuant to the Internal Revenue Code, 26 U.S.C. § 6621, guidelines for underpayment of taxes.