Cheryl D. PICOTTE, Plaintiff,

v.

The COMMUNITY CHILD CARE CENTER OF THE THIRD WARD, INC., Defendant.

No. 95–CV–6065L.

United States District Court, W.D. New York.

Oct. 12, 1995.

Nira T. Kermisch, Rochester, NY, for plaintiff.

Matthew J. Fusco, Chamberlain, D'Amanda, Oppenheimer & Greenfield, Rochester, NY, for defendant.

## DECISION AND ORDER

LARIMER, District Judge.

This is a Title VII action brought for alleged race discrimination. The plaintiff ("Picotte") alleges that defendant Community Child Care Center of the Third Ward (the "Center") subjected her to a course of harassment, ridicule and discrimination on the basis of her race and color. Presently before the Court is the Center's motion to dismiss the amended complaint[1] (which has been converted to a motion for summary judgment) and Picotte's cross-motion for partial summary judgment and for leave to file a supplemental complaint. For the reasons stated below, Picotte's cross-motion for leave to file a supplemental complaint is granted, and the Center's motion for summary judgment is granted as to all claims set forth in Picotte's amended complaint, and perforce to all claims in the proposed supplemental complaint, except that claim or claims arising from Picotte's allegation that she was terminated "by the defendant because of her race and in retaliation for bring [sic] this Title VII complaint against her employer." Picotte's cross-motion for partial summary judgment is denied.

## FACTS

The relevant facts are essentially undisputed. Picotte is a caucasian female. The Center is a not-for-profit corporation formed in 1967 by citizens who were concerned about the absence of child care facilities in predominantly African–American neighborhoods. The Center is open to children of all races and nationalities but, probably because of its location, it receives applications from fewer caucasian families than families of other racial and ethnic backgrounds. The Center's Board consists of fifteen persons, the majority of whom are caucasian.

---

1. Picotte's original complaint was filed on February 1, 1995. On February 23, 1995, prior to any response by the Center, Picotte filed an amended complaint. It is the amended complaint against which the Center moves.

At the time the complaint was filed in February 1995, Picotte was the Executive Director of the Center. She had been hired in June 1994 by vote of the Center's Board of Directors. As Executive Director, Picotte's office was at the Center, where she supervised all employees and all daily activities. No Board member maintains an office at the Center. The only Board members who frequent the Center during the business day are two officers, the President and Secretary, who come twice a week for the purpose of signing payroll checks. The Board meets monthly at a location or locations undisclosed to the Court.

Picotte alleges that she had no problem performing her duties until August 9, 1994, when one of the members of the Board, Katheryn Terrell ("Terrell"), scheduled a private meeting with her. Terrell was and is a Board member but not an officer of the Board. She had not participated in the Board's June decision to hire Picotte because she had been convalescing following surgery. Terrell had just returned to her Board activities in August.

At their meeting, Terrell told Picotte that the Executive Director of the Center should be an African–American. Terrell, who is African–American, indicated that because the Center was an African–American community institution serving primarily African–American children, an African–American Executive Director would provide a positive role model. Terrell never stated that her opinions were the opinions of the Board. Terrell told Picotte that she had no criticism of Picotte personally or of her work performance. This meeting greatly upset Picotte.

Several days later Terrell and Picotte had a telephone conversation during which Terrell questioned Picotte's attempts to seek funds from the City of Rochester. During this conversation Terrell reiterated her opinion that the Executive Director of the Center should be an African–American but that she did not have any criticism of Picotte's job performance.

On or about August 17th, at a meeting of the Board of Directors, a new member of the Board, Ruby Lockhart ("Lockhart"), also an African–American, stated that she was disappointed that the Board had chosen a caucasian person and not an African–American as its Executive Director. That Picotte was doing a fine job and was a fine person was readily admitted by Lockhart. Other members of the Board defended their choice by indicating that no qualified African–American applied for the position. Lockhart did not request any Board action, and none was taken.

Like Terrell, Lockhart was not an officer of the Board and she did not participate in the Board's June decision to hire Picotte (because she was not yet a member).

On August 22nd, Picotte telephoned Terrell about Terrell's concerns. During their conversation, Terrell repeated her views that the Director should be an African–American, though she had nothing against Picotte personally. On this same date, Picotte wrote a grievance letter to the Board, detailing these events and complaining that Lockhart and Terrell practiced racism and bigotry. She requested that they be removed from the Board but indicated that she remained committed to her job and the well-being of the children.

On September 30th, Picotte sent a memo to the Board stating that, until her grievance was addressed and resolved to her satisfaction she would be out of work on disability. In her memo, Picotte indicated that the events set forth in her grievance had affected her physically, mentally and emotionally and that "under doctors orders," she could no longer work.

The Board held a special meeting on October 5th during which Picotte's grievance was specifically addressed and Picotte was asked to express her views. At this meeting the Board issued "guidelines" as follows:

> The Community Child Care Center's Board can not function properly if members take actions contrary to the best interest of the Center and its workers. Therefore, (1) All grievances should be brought before the [Center's] Board of [sic] discussion and approval of action; (2) Board members should accept the Board's final decision; and (3) if any member can

not or will not do this, then that member should not be on the Board.

At this October 5th meeting, the Board decided to conduct another session to investigate Picotte's grievances. At this meeting, which was on October 10th, Terrell and Lockhart were separately questioned. At Terrell and Lockhart's request, an independent third party was permitted to attend these sessions.

As a result of its investigation, the Board concluded that the Center had not engaged in intentional discrimination against Picotte. While individual Board members may have agreed or disagreed with their comments, the Board determined that the sentiments expressed by Lockhart and Terrell were not reflective of the policy of the Board, nor discriminatory. The Board issued a Resolution stating its findings and mandating the following steps:

1.  The Community Child Care Center of the Third Ward hereby confirms its commitment to equal employment opportunity and will distribute to each Board member a copy of its non-discrimination policy.

2.  All direction or communication from the Board to the Executive Director will be made by the current Officers of the Board.

3.  All direction or communication from the Board to the Staff and/or Teachers will be through the Executive Director or the President of the Board.

Picotte returned to her duties as Executive Director in December 1994.

About two months later, on February 1, 1995, Picotte sued the Center alleging unlawful discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2a, and New York Human Rights Law § 296. On March 31st, the Center filed its motion to dismiss. On April 19th, Picotte's employment with the Center was terminated by the Board.

### THE CENTER'S MOTION FOR SUMMARY JUDGMENT

By its March 31, 1995 motion, the Center seeks an order granting it summary judg-

ment and dismissing the amended complaint in its entirety for failure to state a cause of action. Although styled as a motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), the Center has submitted affidavits and documents in support of its motion and requests that the Court treat the motion as one for summary judgment pursuant to Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12.

### A.  *Propriety of Summary Judgment in Title VII Actions*

■ Fed.R.Civ.P. 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Under the rule, the burden is on the moving party to inform the court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) (alteration in original)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356. However, at the summary judgment stage, when perusing the record to determine whether a rational fact-finder could find for the non-moving party, all reasonable inferences must be drawn in favor of the non-moving party. *See Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

■ The general principles underlying a motion for summary judgment apply no less to this action simply because it is brought

under Title VII. Although courts are generally reluctant to grant summary judgment in cases where motive, intent or state of mind are at issue, *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988) (where such is at issue summary judgment should be used sparingly); *accord Montana v. First Federal Savings and Loan Association of Rochester,* 869 F.2d 100, 103 (2d Cir.1989) (summary judgment is ordinarily inappropriate where intent is at issue), "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (the summary judgment rule would be rendered sterile if the mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion). Consequently, once the moving party has met its burden, the non-moving party in a Title VII action must come forward with evidence upon which a rational fact-finder could return a verdict in his favor.

In this case, the Center does not dispute Picotte's allegations. Rather, the Center contends that, assuming they are true, such allegations simply do not constitute a Title VII violation. In other words, Picotte has failed to establish an actionable Title VII claim. I agree. On these facts, summary judgment will be granted and the amended complaint dismissed.

■ Title VII provides that an employer may not "discriminate against any individual with respect to ... terms, conditions or privileges of employment, because of such individual's race [or] color." 42 U.S.C. 2000e–2(a)(1). In this case, Picotte claims that the Center "subjected her to a course of harassment, ridicule and discrimination on the basis of her race and color." Amended Complaint at ¶ 27. As recognized in *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986), "'a discriminatory and offensive work environment so heavily polluted with discrimina-

tion as to destroy completely the emotional and psychological stability of minority group workers' may constitute a violation of Title VII." (*citing Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 924 (5th Cir.1982.)

■ To establish a hostile environment, a plaintiff "must prove more than a few isolated incidents of racial enmity." *Snell, supra,* at 1103. "Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute. * * * [T]he alleged harassment 'must be sufficiently pervasive ... to ... create an abusive working environment. * * * Whether racial acrimony in a particular institution is 'sufficiently pervasive' to constitute a Title VII violation is to be determined from the totality of the circumstances." *Id.* (citations omitted).

■ The standard is an objective one. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).[2] Factors to be considered when determining whether an environment is hostile or abusive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at ——, 114 S.Ct. at 371.

■ In this case, the undisputed comments about which Picotte complains occurred on four occasions: during the August 9th meeting with Terrell; during the telephone conversation with Terrell occurring several days later; during the August 17th Board meeting; and during a telephone conversation with Terrell on August 22nd. There is no evidence that additional comments of a like nature were made after August 22nd. To the extent Picotte complains

---

**2.** It is also necessary that the victim subjectively views the environment as being abusive, because otherwise the conditions of the victim's employment have not been altered in violation of Title

VII. *Harris, supra,* at ——, 114 S.Ct. at 370. In this case Picotte clearly found the environment to be a hostile one.

that Lockhart continued to be critical of her in Board meetings, there is no description of specific statements and, in any event, no suggestion that the criticism was racial or racially based.

The comments made by Terrell and Lockhart were of a slightly different nature than is usually the case in a Title VII action. These comments were not racial epithets or slurs in the typical sense. They were not racially-based personal insults against Picotte, but rather criticism of the Board for hiring a caucasian person rather than an African–American. Terrell and Lockhart told Picotte that they had "nothing against her personally;" they just disagreed with the Board's hiring decision.

Neither Terrell nor Lockhart supervised Picotte. Neither woman was at the Center during business hours. Picotte herself supervised all the employees and all the daily activities that occurred at the Center. It appears that Picotte, as Executive Director, answered only to the Board as a whole (or in some instances to committees thereof). Acting individually, neither Terrell nor Lockhart had any control over Picotte's immediate job responsibilities or her job security. Neither professed to be acting or speaking on behalf of the Board. Each made it clear that they did not criticize Picotte personally but simply had a philosophical objection to her being hired due to her race.

These comments objectively may be viewed as insensitive and confrontational. Indeed, a reasonable person might be upset and annoyed by such statements. However, given the type of statements, the limited number of occasions on which they were made, the circumstances in which they were made, and the respective roles of Picotte, Terrell, and Lockhart, I do not believe that they created a workplace "permeated with discriminatory intimidation, ridicule, and insult ... that [was] sufficiently severe or pervasive to alter the condition of [Picotte's] employment and create an abusive working environment." *Harris*, —— U.S. at ——, 114 S.Ct. at 370 (citations and internal quotes

omitted); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184 (2d Cir.1987) ("[T]o demonstrate a hostile work environment more than an episodic pattern of racial antipathy must be proven ..."); [3] *Bennett v. New York City Dep't of Corrections*, 705 F.Supp. 979 (S.D.N.Y.1989) ("[Plaintiff] must prove more than a few isolated instances of racial friction. * * * [T]he incidents of harassment [must] occur either in concert or with a regularity that can reasonably be termed pervasive.") (citations omitted).

This is not a situation where the plaintiff has been subjected to vicious racial epithets or physically threatening or humiliating actions, or a pattern of such behavior over an extended period of time. *See, e.g., Amirmokri v. Baltimore Gas & Elec. Co*, 60 F.3d 1126 (4th Cir.1995) (Title VII claim properly sustained where for six months plaintiff subjected to daily "national origin" epithets and name-calling, and asked to perform objectively impossible tasks); *Gary v. Long*, 59 F.3d 1391 (D.C.Cir.1995) (in sex harassment case, repeated verbal and physical harassment, culminating in rape, plainly sufficient to state a "hostile environment" claim); *Erebia v. Chrysler Plastic Products Corp.*, 772 F.2d 1250 (6th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986) (plaintiff subjected to racial slurs for five years); *Currie v. Kowalewski*, 842 F.Supp. 57 (N.D.N.Y1994), *aff'd*, 40 F.3d 1236 (2d Cir.1994) (employer created a hostile environment where he continually hugged plaintiff and otherwise touched her in an unwelcome manner, along with making sexual innuendos, sexual advances, and sexual talk, over an eleven month period). Rather, the comments were few in number, they were not racial insults or epithets directed at Picotte personally, and they were made by two disgruntled Board members who individually had no supervisory or other control over Picotte. Thus, while Picotte may have found Terrell and Lockhart's comments subjectively distressing, they do not separately or together create a hostile or abusive work envi-

---

**3.** *Lopez v. S.B. Thomas, Inc.,* involved claims brought pursuant to 42 U.S.C. § 1981, the use of which has since been limited. *See Patterson v.* *McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). The analysis, under Title VII, remains the same.

ronment and cannot form the basis of a Title VII claim.[4]

In her effort to defeat summary judgment, Picotte raises the following factual disputes. Picotte disputes whether, during the August 22nd telephone conversation between Picotte and Terrell, Picotte affirmatively asked Terrell to "repeat her statements." Plaintiff's Response to Statement of Undisputed Facts. The Court finds this to be immaterial: the relevant issue is what Terrell said or did not say, and not whether Picotte specifically solicited such comments.

Picotte further disputes the Center's assertion that neither Lockhart nor Terrell could decide her job performance. As noted above, the Court finds as a matter of law that, as individual members of the Board, neither Lockhart nor Terrell had the power to terminate or demote Picotte. And importantly, neither affirmatively represented that their comments and opinions were those of the Board.

Picotte's only other factual disputes have to do with the Center's assertions that "Plaintiff has suffered no change in her job responsibilities" and "there have been no changes in the terms and conditions of Plaintiff's employment." Center's Statement of Material Facts at ¶¶ 19, 24. Picotte's employment was terminated on April 19, 1995, roughly three weeks after the Center filed its

motion. Presumably the Center no longer contends that these statements are true. However, the issue of Picotte's termination relates more specifically to her motion for leave to supplement, and thus is not relevant to the present motion. (*See* discussion below.)

Nor does plaintiff come forward elsewhere in her opposing papers with any genuine dispute over the facts. Indeed, Picotte provided still further factual information about her allegations, which information is not disputed by the Center and does not alter the Court's conclusion.

Thus, the Court finds that Picotte has failed to come forward with specific facts showing that there is a genuine issue for trial. Therefore, the Center's motion for summary judgment is granted and Picotte's amended complaint is dismissed in its entirety.[5]

## PICOTTE'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT [6]

By way of opposing the Center's motion for summary judgment, Picotte seeks leave to serve a supplemental complaint. Specifically, she seeks to add the allegation that "On April 19, 1995, Plaintiff was terminated by the Defendant because of her race

---

**4.** Because the Court finds that the complained of actions do not constitute a Title VII violation, it is not necessary to analyze the liability, *vel non*, of the Center for the actions of its Board members. *See e.g. Karibian v. Columbia University*, 14 F.3d 773 (2d Cir.1994), *cert. denied*, — U.S. —, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994), ("an employer is liable for the discriminatory abusive work environment created by a supervisor if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship"); and *Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59 (2d Cir.1992) ("where a low-level supervisor does not rely on his supervisory authority to carry out the harassment, the situation will generally be indistinguishable from cases in which the harassment is perpetrated by co-workers; consequently the employer will not be liable unless the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it"); *see also Tomka v. The Seiler Corporation, et al*, 66 F.3d 1295 (2d Cir.1995).

**5.** In addition to her Title VII claim, Picotte's state law claim, brought pursuant to New York Human Rights Law § 296 is dismissed as well. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Girard v. 94th & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976).

**6.** Picotte's request is one for leave to "serve a supplemental complaint", presumably made pursuant to Fed.R.Civ.P 15(d). The legal standards applied to such request are no different than those applied to a motion for leave to "amend" pursuant to subpart (a) of Rule 15. *See Soler v. G & V, Inc.*, 103 F.R.D. 69, 73 (S.D.N.Y.1984) ("Rule 15(d) motions should be viewed with the same liberal principles applicable to Rule 15(a) motions"); *See also United States v. International Business Machines Corp.*, 66 F.R.D. 223 (S.D.N.Y.1975).

and in retaliation for bring [sic] this Title VII complaint against her employer." Supplemental Complaint at ¶¶ 25, 31 and 38.

■■■■ Under Fed.R.Civ.P. 15(a) the Court has discretion to grant a plaintiff leave to amend his pleadings. *Evans v. Syracuse City School District,* 704 F.2d 44 (2d Cir. 1983). Leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "[J]ustice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the opposing party." *S.S. Silberblatt, Inc. v. East Harlem Pilot Block–Bldg. 1 Hous. Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979).

■■■ A court may also deny leave to amend where the amended pleading is considered futile. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). "In this Circuit, an amendment is considered futile if the amended pleading fails to state a claim." *Tri–State Judicial Services, Inc. v. Markowitz,* 624 F.Supp. 925, 926 (E.D.N.Y.1985). Thus, when analyzing a motion for leave to amend, the court must determine whether any facts exist under which a cause of action for retaliation could be sustained.

In this instance, Picotte is not guilty of undue delay or bad faith. She moved for leave to supplement within eight days of her employment termination. Nor can this supplement be deemed unduly prejudicial to the Center: the lawsuit was initiated only two months prior to the motion for leave to supplement; no discovery has occurred; no trial date has been set; and the Center has not yet even answered.

Nor can the supplemental complaint be deemed futile. As set forth below, the Center has not demonstrated that there are no circumstances under which Picotte's claim can be sustained.

■■■■ Title VII prevents employers from firing an employee in retaliation for his opposition to a discriminatory employment practice. 42 U.S.C. 2000e–3(a). To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) participation in protected activity, of which the alleged retaliator was aware; (2) a disadvantageous employment action taken against him/her; and (3) a causal connection between the protected activity and the disadvantageous employment action. *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d. Cir.) (citations omitted), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) "Proof of a causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, . . ." *Id.*

Here, Picotte participated in protected activity by filing her Title VII lawsuit (which is obviously known to the Center). And her termination is undeniably a "disadvantageous employment action taken against her." Finally, because Picotte was terminated approximately two and one half months after bringing this Title VII action, she has adequately pled a causal relationship between her protected activity and the adverse employment action. *See Manoharan v. Columbia U. Col. of Phys. & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988) ("Proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.") (citations omitted). Thus, Picotte has set forth a *prima facie* case of retaliatory discharge. It cannot be said that there are no circumstances under which her claim could not be sustained.[7]

Accordingly, this Court grants Picotte's leave to serve a supplemental complaint. Although Picotte's amended complaint fails to state a claim upon which relief can be granted, only that part of the supplemental complaint asserting that she was terminated "because of her race and in retaliation for bringing this Title VII complaint against her employer" is sustained. Fed.R.Civ.P. 15(c). Plaintiff is granted leave to file her supple-

---

**7.** The Center opposes Picotte's motion to amend with additional affidavits and supporting evidence setting forth the Center's alleged basis for terminating Picotte. Because the legal standard for determining the validity of this motion to amend is "futility", the Court does not now weigh the Center's supporting evidence.

mental complaint within ten (10) days of entry of this decision.

## CONCLUSION

For all the above reasons, Picotte's cross-motion for leave to file a supplemental complaint (Docket # 10) is granted. The Center's motion for summary judgment (Docket # 8) is granted as to all claims set forth in Picotte's amended complaint and the amended complaint is dismissed. Picotte's cross-motion for partial summary judgment (Docket # 10) is denied.

IT IS SO ORDERED.