Richard W. SEILS, Individually and on Behalf of All Other Persons Similarly Situated, Lois Vreeland, Individually and on Behalf of All other Persons Similarly Situated, Plaintiffs,

v.

**ROCHESTER CITY SCHOOL DISTRICT, et al.,**
Defendants.

No. 98–CV–6197L.

United States District Court,
W.D. New York.

Jan. 23, 2002.

Emmelyn Logan-Baldwin, Rochester, NY, for plaintiff.

Stephanie L. Adler, Harter, Secrest and Emery LLP, Rochester, NY, Maureen T. Alston, Harter, Secrest and Emery LLP, Rochester, NY, for defendants.

Emmelyn Logan-Baldwin, Rochester, NY, for movants.

## DECISION AND ORDER

LARIMER, Chief Judge.

## I. INTRODUCTION

The facts of this case are set forth in my prior decisions[1], entered March 15, 2001 (199 F.R.D. 506 (W.D.N.Y.2001)) and December 12, 2000 (Dkt.# 139), familiarity with which is assumed, and will not be repeated at length here. Briefly, Richard Seils ("Seils") and Lois Vreeland ("Vreeland") (collectively "plaintiffs"), who have been teachers in defendant Rochester City School District ("RCSD") and members of former defendant Rochester Teachers' Association ("RTA"), commenced this action against twenty-eight defendants. They allege, in fifteen separate causes of action, claims involving breach of contract, discrimination, and retaliation in violation of Title VII, 42 U.S.C. § 1983 (" § 1983"), 42 U.S.C. § 1985 (" § 1985"), and the N.Y. Human Rights Law ("HRL").

The amended complaint, containing 138 separate paragraphs covering 35 pages, alleges claims on behalf of a purported class for violations of Title VII, § 1983 and the HRL. In addition, both Seils and Vreeland set forth separate individual claims of a similar nature. The case has not been certified as a class action. Twenty-seven of the named defendants are directly related to RCSD ("the RCSD defendants"). They include past or present RCSD employees and past or present members of its board.

The tortured procedural history of this case conjures up the image of *Jarndyce v. Jarndyce,* so vividly portrayed by Charles Dickens in *Bleak House.*[2] Because a full recitation of the history of this case might task even devotees of *Jarndyce v. Jarndyce,* the Court will recount only that which is necessary for its present purpose: deciding the motions presently before it,

1. By decision and order, entered December 12, 2000, I granted RTA's motion for summary judgment. RTA is, therefore, no longer a party in this action.

2. *Jarndyce and Jarndyce* drones on.... Innumerable children have been born into the cause; innumerable young people have married into it; innumerable old people have died out of it. Scores of persons have deliriously found themselves made parties in *Jarndyce and Jarndyce* without knowing how or why; whole families have inherited legendary hatreds with the suit. The little plaintiff or defendant who was promised a new rocking-horse when *Jarndyce and Jarndyce* should be settled has grown up, possessed himself of a real horse, and trotted away into the other world. Fair wards of court have faded into mothers and grandmothers; a long procession of Chancellors has come in and gone out; the legion of bills in the suit have been transformed into mere bills of mortality;... but *Jarndyce and Jarndyce* still drags its dreary length before the court, perennially hopeless.

Charles Dickens, *Bleak House* (1853); *see also Hughes Tool Co. v. Trans World Airlines, Inc.* 409 U.S. 363, 393, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (Burger, C.J., dissenting) ("To describe this litigation as a 20th-century sequel to *Bleak House* is only a slight exaggeration").

namely, RCSD's separate motions to dismiss, or, in the alternative, for summary judgment with respect to each plaintiff, and plaintiffs' cross-motions to certify this action as a class action, to modify or amend this Court's prior decisions, orders, and judgments, for partial summary judgment, injunctive relief, to amend the complaint, and for various forms of discovery-related relief.

Plaintiffs have made the Court's review more difficult by the voluminous and often vague and repetitive papers submitted in response to defendants' motion or in support of plaintiffs' various cross-motions. The volume and prolixity is seemingly "designed to obscure rather than to illumine the events giving rise to this lawsuit." *See Pross v. Katz,* 784 F.2d 455, 456 (2d Cir. 1986). Indeed, on the instant motions alone, plaintiffs have made 34 separate filings that when stacked together creates a pile eight inches thick. Included among them, for example is a 149 paragraph affidavit of 46 pages (not including exhibits) (Dkt.# 189), two 125 paragraph affirmations of 38 pages each (not including exhibits) (Dkt. # s 190, 199), two 61 paragraph reply affirmations of 27 pages each (not including exhibits) (Dkt. # s 182, 183), 19 additional affidavits and affirmations, memoranda of law with a combined total of 90 pages (Dkt. # s 178, 179, 187, 211), and two statements of material facts (which Local Rule 56 of the rules of this Court require to be "short and concise") that are 113 paragraphs each (not including exhibits) (Dkt. # s 188, 197).

In addition, plaintiffs' counsel frequently "incorporated by reference" virtually every document filed in this case and in several cases which she considers "related" of equally voluminous nature. (See Dkt. # s 186, 196). Together, all of these papers would be measured by feet rather than inches. Moreover, plaintiffs' failure to furnish specific citation and argument as to how these myriad papers demonstrate any issue of fact warranting trial:

> assumes the district court has an affirmative obligation to plumb the record in order to find a genuine issue of material fact. It does not. A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Once [defendant] met its burden of demonstrating a lack of genuine issues of material fact, [plaintiff] was required to designate specific facts creating a triable controversy.

*Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 260 (8th Cir.1996) (citations and internal quotation marks omitted); *see also Friedel v. City of Madison,* 832 F.2d 965, 969 (7th Cir.1987) (stating that it was not the court's "duty on appeal to wade through the record and make arguments for either party" and that the nonmoving parties were "fatally remiss in citing to the district court portions of the record that they claimed supported their assertions"). This is not the first time that I have admonished plaintiffs' counsel in this case for her failure to specify the relevance of materials on which she has sought to rely. *See* Court's letter to plaintiffs' counsel, dated February 15, 2000. While, as a general proposition, it is important to submit the necessary evidence, in this case, much of what has been submitted is either redundant, irrelevant, speculative, conclusory, or all of the above.

## II. FACTUAL BACKGROUND

### A. *Richard Seils*

Seils, a fifty-nine year-old Caucasian male, had been employed by RCSD as a teacher since 1968; he retired in 1998. In large part, Seils' complaint stems from an

incident in December 1995 where Seils was accused of striking a student while employed as a technology teacher at Frederick Douglass Middle School ("Douglass"). Seils was disciplined for that action. He alleges in this complaint that "defendants"[3] punished him and other RCSD employees "based on race and/or age and/or sex and/or national origin and/or disability," and that older[4] Caucasian employees were more severely punished than other employees (Complaint, ¶ 52).

### B. *Lois Vreeland*

Vreeland has been a special education teacher at Franklin High School ("Franklin") since 1988. In January 1996, Vreeland obtained an order of protection from the Rochester City Court, pursuant to section 530.13 of the New York Criminal Procedure Law, against Elizabeth Pardner, a parent of one of Vreeland's students. Pardner had previously threatened Vreeland. The order prohibited Pardner from having any contact with Vreeland. Nevertheless, in violation of the order, Pardner gained entry into Franklin, and an encounter between the two women ensued.

In February 1996, Vreeland filed a grievance alleging that RCSD violated section 25 of the RTA–RCSD collective bargaining agreement because the building administrator "allowed subject of court order of protection into [the school] build-ing...." The parties subsequently agreed that Franklin's building administrator would be advised to be more attentive to any orders of protection involving Vreeland. Based upon a number of factors, including (a) RCSD's assurance that orders of protection would be more closely monitored in the future, (b) the order of protection involving Vreeland was to expire by its own terms on July 26, 1996, and (c) the student whose parent was involved would no longer be attending Franklin after June 1996, the Grievance Committee decided, after consultation with Vreeland, to close the grievance.

Vreeland also alleges a laundry list of claims she considers "harassment" by students and parents or guardians of students that she experienced while at Franklin. Although it is unclear, Vreeland appears to claim that she was harassed by students and their parents because she is Caucasian, or female, or older, or disabled, or married to an African–American male, or the mother of mixed-race children.

## III. DISCUSSION

RCSD now moves for summary judgment[5] against both Seils and Vreeland on all causes of action on several grounds. For the reasons that follow, the motions are granted and the amended complaint is dismissed.[6]

---

3. As is the case throughout the complaint, plaintiffs are very vague as to precisely which defendant did what to cause the statutory violations alleged here.

4. At the time he filed his charge of discrimination with the EEOC, he was fifty-three.

5. RCSD moved to dismiss, or, in the alternative, for summary judgment. The motions have been treated as ones for summary judgment. Both parties have submitted a considerable amount of material that is outside of the pleadings. Moreover, plaintiffs have repeatedly referred to the instant motions as ones for summary judgment. *See* Plaintiffs' Memorandum, Dkt. # 211 (acknowledging that RCSD is moving for summary judgment, in the alternative).

6. I note initially that many of these issues were addressed at length in this Court's decision and order, entered December 12, 2000 (Dkt.# 139). The decision also outlined with specificity the numerous deficiencies in plaintiffs' claims. Although the decision admittedly addressed plaintiffs' claims against RTA, plaintiffs' claims against the remaining defendants suffered from many of the same infirmities. Nevertheless, despite the passage of

## A. Summary Judgment—General Standards In Discrimination Cases

The standard for deciding summary judgment motions is well established. Rule 56(c) provides that a motion for summary judgment shall be granted if the pleadings and supplemental evidentiary materials "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Under the rule, the burden is on the moving party to inform the Court of the basis for its motion and to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (quoting FED. R. CIV. P. 56(e)).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348. When perusing the record to determine whether a rational fact-finder could find for the non-moving party, however, all reasonable inferences must be drawn in favor of the non-moving party. *See Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988).

■ The general principles underlying a motion for summary judgment fully apply to discrimination actions. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000). Although courts should be cautious about granting summary judgment in cases where motive, intent or state of mind are at issue, *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988); *Montana v. First Federal Savings and Loan Association of Rochester*, 869 F.2d 100, 103 (2d Cir.1989), "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (summary judgment rule would be rendered sterile if mere incantation of intent or state of mind would act as a talisman to defeat an otherwise valid motion). Consequently, once the moving party has met its burden, the non-moving party in a discrimination action must come forward with evidence upon which a rational fact-finder could return a verdict in his favor. For a plaintiff in a discrimination case to survive a motion for summary judgment, he or she must do more than present "conclusory allegations of discrimination," *Meiri v. Dacon*, 759 F.2d 989 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); he or she must offer "concrete particulars" to substantiate the claim. *Id.* (cited in *Duprey v. Prudential Ins. Co.*, 910 F.Supp. 879 (N.D.N.Y.1996)).

## B. Plaintiffs' Reverse Race Discrimination Claims

In this case, both plaintiffs claim that they are the victims of race discrimination

over a year since this Court entered that decision, plaintiffs have persisted in their assertions, notwithstanding their prior knowledge of the Court's order. This Court has admon-

ished plaintiffs' counsel previously for tactics employed in this case. *See, Seils v. Rochester City School Dist.*, 199 F.R.D. 506, 511, n. 8 (W.D.N.Y.2001).

(Seils—6th cause of action; Vreeland—12th cause of action). Generally, such a claim is analyzed pursuant to the traditional burden-shifting paradigm articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In general, to establish a *prima facie* case of race discrimination, a plaintiff must show that: (1) he is a member of a racial minority; (2) he was performing satisfactorily; (3) he suffered some adverse employment action; and (4) such action occurred under circumstances giving rise to an inference of discrimination. *See Duclair v. Runyon*, 166 F.3d 1200, n. 2, 1998 WL 852867 (2d Cir.1998) (unpublished opinion) (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir.1997)).

This is not the typical race discrimination case, however, since both plaintiffs here are Caucasian and, therefore, not members of any minority group. Plaintiffs claim reverse discrimination *against* Caucasians by defendants (many of whom are also Caucasian). Of course, discrimination based on race, whether it is African–American or Caucasian, is prohibited by Title VII and the Supreme Court so held many years ago in *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

The Supreme Court ruled that Title VII "prohibits all racial discrimination in employment, without exception for any group of particular employees ...." It further held that the dictates of Title VII "are not limited to discrimination against members of any particular race [and Title VII] proscribe[s] racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites." *Id.* at 278–79, 280, 96 S.Ct. 2574.

Courts have struggled in attempting to apply the *McDonnell Douglas* burden-shifting framework to Title VII suits by Caucasian plaintiffs, and no universally accepted statement of the appropriate standard has emerged. The confusion arises from the wording of the first prong of the test. Obviously, a Caucasian plaintiff cannot establish membership in a minority group in the same way an African–American plaintiff can. In an effort to force [7] reverse discrimination cases to fit into the *McDonnell Douglas* framework, some courts require Caucasian plaintiffs to establish "background circumstances" supporting the suspicion that the defendant is that unusual employer who discriminates against the majority. *See, e.g., Parker v. Baltimore & O.R.R. Co.*, 652 F.2d 1012, 1017 (D.C.Cir.1981) [8], instead of showing minority group status. In *Parker*, the court also insisted that the "background circumstances" test "is not an additional hurdle for white plaintiffs," and asserted that it was merely "a faithful transposition

---

**7.** *See Eastridge v. Rhode Island College*, 996 F.Supp. 161, 167 (D.R.I., 1998) ("attempting to cram a reverse discrimination case into the *McDonnell Douglas* framework is not a reasonable approach...."); *Cully v. Milliman & Robertson, Inc.*, 20 F.Supp.2d 636, 641 (S.D.N.Y.1998) (same).

**8.** *See also Rhoads v. Wal–Mart Stores, Inc.*, 83 F.3d 433, 1996 WL 194854 (10th Cir.1996);

*Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 457 (7th Cir.1999); *Duffy v. Wolle*, 123 F.3d 1026, 1036–37 (8th Cir.1997); *Reynolds v. School Dist. No. 1*, 69 F.3d 1523, 1534 (10th Cir.1995); *Notari v. Denver Water Dep't*, 971 F.2d 585, 588–89 (10th Cir.1992); and *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985).

of the *McDonnell Douglas /Burdine* test" into the context of reverse discrimination. *Id.* at 154.

Some courts have concluded, however, that substituting "background circumstances" for the first prong of *McDonnell Douglas* does, in fact, raise the bar, and those courts have rejected the *Parker* analysis for that reason. For example, in *Eastridge,* the court concluded that the *Parker* test "require[s] a reverse discrimination plaintiff to show that the specific employer has displayed a pattern of discrimination against the majority in the past [and therefore] imposes a more onerous burden on such a plaintiff as compared to any plaintiff from any protected group." 996 F.Supp. at 161. *See also Ulrich v. Exxon Co.,* 824 F.Supp. 677, 683–4 (S.D.Tex.1993) (describing the "background circumstances" test as imposing a "heightened burden" and citing cases that have criticized it). In *Cully v. Milliman & Robertson, Inc.,* 20 F.Supp.2d 636, 641 (S.D.N.Y., 1998), the court described *Parker* as requiring a "higher *prima facie* burden for reverse discrimination plaintiffs." In *Collins v. School District of Kansas City,* 727 F.Supp. 1318, 1320 (W.D.Mo., 1990), the court concluded that the "background circumstances" test required a "special showing" of Caucasian plaintiffs, and rejected the test for that reason. The court also concluded that the "unusual employer" prong of *Parker* established an "arbitrary barrier which serves only to frustrate those who have legitimate Title VII claims."

In addition to the concerns expressed by the aforementioned district courts, the Sixth Circuit has questioned its earlier adoption of the test. In *Murray v. Thistledown Racing Club,* the Sixth Circuit stated: "[w]e agree with the district court that a *prima facie* case of 'reverse discrimination' is established upon a showing that

'background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" 770 F.2d 63, 67 (6th Cir.1985) (citing *Parker*). However, nine years later in *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir.1994), the same court noted that the "background circumstances" test had been criticized for imposing a "heightened standard," on Caucasian plaintiffs, and observed: "[w]e have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts." *Pierce,* 40 F.3d at 801, n. 7. Ultimately, the *Pierce* court did not have to resolve the obvious tension between that pronouncement and *Murray*'s adoption of that test, because the plaintiff in *Pierce* could not meet the second prong of the *McDonnell Douglas* test.

Most recently, the Third Circuit rejected the "background circumstances" analysis set forth in *Parker* and its progeny, in favor of a standard under which a plaintiff who brings a reverse discrimination suit under Title VII should be able to establish a *prima facie* case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of his race, color, religion, sex, or national origin. *Iadimarco v. Runyon,* 190 F.3d 151, 157–163 (3d Cir.1999) (internal quotation marks omitted).

The Second Circuit has not taken a position on this issue, and the district courts in this circuit have split on it. *Compare, e.g., Olenick v. New York Telephone,* 881 F.Supp. 113, 114 (S.D.N.Y.1995) (adopting "background circumstances" test); *Umansky v. Masterpiece Int'l Ltd.,* 1998 WL 433779 (S.D.N.Y.1998) (following *Olenick*)

*with Cunliffe v. Sikorsky Aircraft Corp.*, 9 F. Supp.2d 125 (D.Conn.1998) (rejecting *Olenick*); *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d 249, 260–262 (E.D.N.Y.1999) (rejecting "background circumstances" test, and instead assessing whether or not an inference can be drawn from the established facts that the employer treated Caucasian plaintiff less favorably because of his race); and *Cully v. Milliman & Robertson, Inc.*, 20 F.Supp.2d 636, 641 (S.D.N.Y.1998).

While I find the Third Circuit's thorough analysis in *Iadimarco* persuasive, I need not decide this issue today because, regardless of the test used, plaintiffs have failed to establish a *prima facie* case of reverse race discrimination, since they have failed to meet the most important requirement of a *prima facie* case, namely that the actions on which they base their claims occurred under circumstances giving rise to an inference of discrimination.

Although not conclusive on the issue, it is certainly noteworthy to point out that the teachers and administrators in this school district were largely white. The statistics, submitted in connection with plaintiff's filings, demonstrate that whites outnumber blacks in the district as a whole and in the two schools involved, Franklin High School and Douglas Middle School.[9] Although it is certainly not impossible for

discrimination to occur in this circumstance, it still seems that RCSD would indeed be the "unusual employer," *see, e.g., Parker v. Baltimore & O.R.R. Co.*, 652 F.2d at 1017, who chose to discriminate not against the minority but against the substantial majority of its employees.

Neither Seils nor Vreeland has presented any evidence to suggest that the RCSD defendants treated Caucasians less favorably than non-Caucasians. Plaintiffs must do more than rest on the allegations in the complaint or on their subjective feelings as to the cause of their troubles. Moreover, careful analysis of the facts relating to both Seils and Vreeland demonstrates that there is neither direct evidence nor background circumstances which would permit an inference to be drawn that RCSD treated plaintiffs less favorably because of their race, age or gender. *See Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d 249, 260–262 (E.D.N.Y.1999); *see also Weeks v. Union Camp Corp.*, 215 F.3d 1323, 2000 WL 727771, *6 (4th Cir. 2000) (unpublished opinion).

Other than plaintiffs' own conjecture and speculation, there is no evidence that the actions of the RCSD defendants were motivated by race. Plaintiffs' counsel recites a lengthy list of events that have allegedly occurred over the years in the

---

**9.** Indeed, plaintiffs themselves offer evidence that, on the whole, Caucasian full-time staff members at RCSD outnumbered African–American full-time staff members by a margin of 3,329 to 965, according to a report prepared on November 8, 1989, the most recent information offered. See Ex. C to Plaintiffs' Statement of Facts, Dkt. Nos. 188, 197. The report further provides that 71.18% of the total full-time staff at RCSD was white in 1989, while only 20.63% of full-time staff was black. Id. The only other more recent evidence delineates the numbers of individuals in the teachers' bargaining unit. That evidence details that Caucasian teachers in the RCSD bargaining unit at Douglass, where

Seils worked, outnumbered African–American teachers by a margin of 84 to 14 in 1999, and that Caucasian teachers in the RCSD bargaining unit at Franklin, where Vreeland worked, outnumbered African–American teachers by a margin of 67 to 26 in 1999. See Ex. 11 to Affs. of Emmelyn Logan–Baldwin, Dkt Nos. 190, 199. On the whole, Caucasian teachers in the RCSD bargaining unit outnumbered African–American teachers by a margin of 2,386 to 514 in 1999. Id. These kinds of statistics do not lend support to plaintiffs' claim that blacks, who comprised the minority, would be treated more favorably than whites, who constituted the vast majority.

Rochester city schools. Those events, however, had nothing to do with Seils or Vreeland and their very specific claims.

### 1. Seils' Claims

■ The heart of Seils' race discrimination claim relates to the discipline imposed on him for striking a student. The evidence establishes that, immediately following the December 12, 1995 altercation between Seils and a student, two witnesses, Iris Banister and Jeanette Madalena, reported that they saw Seils punch the student. It was based upon the reports of those disinterested administrators, one African–American and one Caucasian, that RCSD took its action against Seils. In response, Seils has not explained why these administrators would have any reason to lie about the incident or why Madalena, who is white, would have any reason to discriminate against Seils on the basis of race.

It was, to say the least, reasonable for RCSD administrators to discipline Seils based on this credible evidence. Moreover, the discipline itself was limited to a two day suspension without pay and the requirement that Seils attend a course entitled "Discipline With Dignity."

Although Seils makes the bald assertion that others were treated differently, he has failed to identify any such individual. In response, the RCSD defendants contend that when this issue was raised in discovery, the employees identified by Seils as fitting in this category were both African–American and Caucasian. Of course, this admission by plaintiff himself leads to the inescapable conclusion that whites and blacks alike were treated in the same manner. It can hardly serve as evidence of disparate treatment on the basis of race.

Seils objected to the disciplinary action and, pursuant to the collective bargaining agreement, filed a grievance. After conducting an extensive hearing, a respected independent arbitrator ruled against Seils and upheld the discipline imposed. This is certainly compelling evidence that the RCSD defendants were not motivated by any discriminatory animus whatsoever. Seils' attempt now to create an issue of fact by submitting affidavits from some individuals with some knowledge of the events is unavailing. First of all, the affidavits produced are not at all compelling. There are contradictions between the affidavits and, in some cases, internal inconsistencies. The principal defect is that most of the individuals who submitted affidavits on Seils' behalf, admit that they saw only a portion of the altercation between Seils and the student. But, of course, whether plaintiff actually punched the student, or whether the district made the proper decision are not the ultimate questions before this Court. Although, on the merits, the decision to suspend Seils seems justifiable, whether this Court believes that to be the case or not is not germane. In fact, it is not the court's province to second-guess such a personnel decision. What matters is why RCSD did what it did, not whether it was wise to do so. Title VII prohibits discrimination, not poor judgment. *See Gumbs v. Hall*, 51 F.Supp.2d 275, 282 (W.D.N.Y.1999); *see also Montana v. First Fed. Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (federal courts do not have a "roving commission to review business judgments") (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir.1987)); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988) ("[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons"); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.) (courts "must refrain from intrud-

ing into an employer's policy apparatus or second-guessing a business's decision-making process"), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Mesnick v. General Electric Co.*, 950 F.2d 816, 825 (1st Cir.) ("[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' non-discriminatory business decisions"), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Graefenhain*, 827 F.2d at 20 ("A business decision need not be good or even wise. It simply has to be nondiscriminatory..."). Employers should be free to choose how to discipline their employees without being subjected to liability merely because the candidates are of a different race. In this instance, the unrebutted evidence is that RCSD meted out a measured and appropriate discipline on Seils after investigating the incident and receiving credible evidence of Seils' actions.

The school district determined there were grounds for the discipline, an independent arbitrator affirmed the decision, and plaintiff has failed to demonstrate that the decision was based on some ulterior, discriminatory motive. In fact, plaintiff's argument often verges on paranoia when he suggests that virtually all participants from RCSD administrators, RTA representatives, the independent arbitrator, and others, somehow engaged in a conspiracy to discriminate.

Although it is clear that Seils has failed to raise a *prima facie* case of race discrimination, even assuming through the most liberal interpretation that a *prima facie* case has been made, Seils has failed to produce evidence to rebut the proffered non-discriminatory basis for the RCSD defendants' actions, and summary judgment is therefore appropriate.

## 2. Vreeland's Claims

There are a number of reasons, procedural and substantive, as to why the RCSD defendants' motion for summary judgment must be granted as to those claims raised by Vreeland.

### a. Procedural Defects Concerning Vreeland's Claims

■ Many of Vreeland's federal claims suffer from the fatal procedural infirmity that they were untimely on December 1, 1997 when she filed her charge. This alone mandates dismissal of all such claims. It is axiomatic that allegations of discrimination occurring more than 300 days prior to the date a charge is filed are time-barred under Title VII. *See, e.g.*, 42 U.S.C. § 2000e–5(e)(1); *Butts v. New York Dep't of Housing Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993). Therefore, her federal claims are limited to incidents alleged to have occurred on or after February 3, 1997, 300 days before she filed her original charge in December 1997.

■ Vreeland concedes that many of her claims were based on acts alleged to have occurred more than 300 days before she filed her EEOC complaint, but argues that they are preserved by the continuing violation exception to the statute of limitations, and that therefore they are insulated from the RCSD defendants' summary judgment motion. The "continuing violation exception" to the general 300 day limitation provides that if a plaintiff "files a timely EEOC charge about a particular discriminatory act committed in furtherance of an ongoing policy of discrimination," the statute of limitations is extended "for all claims of discriminatory acts committed under that policy." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997); *see Harris v. City of New York*, 186 F.3d 243, 248–50 (2d Cir.1999).

■ To invoke the doctrine, a plaintiff must show either (1) "specific ongoing discriminatory policies or practices," or (2) "specific and related instances of discrimination [that] are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 766 (2d Cir.1998) (quoting *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994)); *see also Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993) ("[M]ultiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation"), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).

Vreeland fails to allege any "specific ongoing discriminatory policies or practices" in her amended complaint. Her conclusory allegations are wholly insufficient. *Weeks v. New York State Division of Parole,* 273 F.3d 76, 91 (2d Cir.2001). The law is clear that the continuing violation exception applies only where there are "specific" or "identifiable" discriminatory customs or practices, or specific and related acts that are tantamount to such customs or policies. *Id.* Moreover, she has failed to offer any proof whatsoever to support her allegations in response to the RCSD defendants' summary judgment motion. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d at 907 ("[a]lthough the mere allegation of the existence of [a discriminatory] policy would be sufficient to withstand a challenge for failure to state a claim, something more is required to avoid summary judgment on the issue"). Vreeland's rejoinder is that she has alleged a number of incidents. This is not enough to secure the protection of the continuing violation doctrine. *See Weeks v. New York State Division of Parole,* 273 F.3d at 91 ("[t]he events pleaded, though embroidered with adjectives and adverbial phrases, are few and unlinked; they are 'not continuous in time with one another or with the timely acts that she has alleged' ") (quoting *Quinn v. Green Tree Credit Corp.,* 159 F.3d at 766).

Even if the alleged discriminatory incidents were continuous and related, Vreeland cannot overcome the statute of limitations because RCSD did not "permit[ ]" the alleged violations "to continue unremedied for so long" that their repetition "amount[ed] to a discriminatory policy or practice." *Id.* Vreeland concedes that RCSD took remedial action on the (untimely) incidents through internal channels, to the extent Vreeland reported them. In sum, Vreeland identifies no discriminatory policy of RCSD, and alleges no toleration of incidents that would be tantamount to such a policy. Therefore, those claims will be dismissed.

b. Merits of Vreeland's Claims

■ Even if Vreeland survives this procedural hurdle, summary judgment is proper, on the merits, because Vreeland has failed to establish a *prima facie* case that the RCSD defendants acted in her case with a motive to discriminate against whites. First of all, it is not at all clear as to the nature of Vreeland's complaint of reverse discrimination. She did not suffer any adverse employment action at the hands of RCSD. The complaint seems to be that RCSD's officials, for the large part unidentified and unnamed, failed or neglected to discipline students who engaged in inappropriate behavior in Vreeland's classes. It appears that Vreeland had a series of disciplinary problems with several students in a class that may have been difficult to begin with since it involved special education students. But, the defect here is that Vreeland has failed to set forth sufficient evidence that discrimination against Caucasians was more than

likely the reason for the district's alleged failure to act concerning these student-teacher problems. It is hard to see this as anything other than a case involving students having disciplinary problems with a teacher. The broad, sweeping nature of Vreeland's claims is highlighted by the fact that she claims multiple forms of discrimination. She not only alleges discrimination because she was white, but because she was female, disabled and of a certain national origin. Vreeland's speculative and conclusory allegations cannot establish discriminatory motive. *See Duclair v. Runyon,* 166 F.3d 1200, 1998 WL 852867 (2d Cir.1998) (unpublished opinion) ("the Supreme Court has made clear, as have numerous opinions from this court, that the burden of persuasion—the obligation to prove his or her case—is at all times borne by the plaintiff").[10]

Reduced to its most fundamental level, Vreeland's is simply a case of a person who disagrees with the manner of discipline imposed on various students and their care givers. The mere fact that Vreeland's list of instances in which she was offended by her students is long does not necessarily strengthen her claims. Either taken individually or as a group, Vreeland's numerous allegations fail to demonstrate the requisite racial animus against her. To the contrary, the evidence reveals that administrators at Franklin responded, in large measure, to Vreeland's complaints contemporaneously. For example, Vreeland does not challenge defendants' assertion that of the 17 students about whom Vreeland appears to complain, only three were involved in more than one identified incident. Of those three students, one was suspended for his second

offense; another was segregated from Vreeland and ultimately transferred to another school; and the third received a long-term suspension and also ultimately transferred to another school.

In light of the undisputed facts, there is no basis on which to find any inference that the RCSD defendants responded to the alleged harassing acts of students and their parents with any racial animus against Vreeland. As a result, Vreeland has failed to establish a *prima facie* case of reverse race discrimination. *See Cooper v. Wyeth Ayerst Lederle,* 106 F.Supp.2d 479, 495 (S.D.N.Y.2000) ( holding that "Title VII does not convey upon an employee the absolute right to demand that a workplace dispute be resolved in a way that is most attractive to her. Title VII simply requires that the remedial action taken be reasonably calculated to end the sexual harassment").

In addition, even if a *prima facie* case has been made, Vreeland cannot point to anything specifically in the record that indicates that RCSD's stated reasons for responding as it did in each instance were a ruse. Vreeland, like Seils, has failed to produce evidence to rebut the proffered non-discriminatory basis for the RCSD defendants' actions and summary judgment is therefore appropriate.

### 3 RCSD's Non–Discriminatory Reasons for Its Decisions

Having thoroughly reviewed the record before me in a light most favorable to the plaintiff, I find no evidence to suggest that RCSD's stated non-discriminatory reasons for its decisions to discipline Seils as it did or to respond to Vreeland's many com-

---

**10.** For many of the same reasons articulated above, I further find that neither Seils nor Vreeland has established a *prima facie* case of age discrimination, and that Vreeland has not established a *prima facie* case of sex discrimi-
nation, or demonstrated that the legitimate, non-discriminatory reasons articulated by the RCSD defendants were a pretext for such unsupported allegations of discrimination.

plaints as it did were false, and plaintiff's mere speculations are insufficient to establish pretext. *See Schnabel v. Abramson*, 232 F.3d 83, 88, n. 2 (2d Cir.2000) (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106) ("while McDonnell Douglas provides a useful analytical framework, ... 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff' "); *see also Ellenbogen v. Projection Video Services, Inc.*, 99–CV–11046, 2001 WL 736774 (S.D.N.Y. June 29, 2001) (promotion case). I, therefore, conclude that summary judgment is appropriate.

The recent United States Supreme Court case of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), does not require a different result. In *Reeves*, the Supreme Court held that:

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.*, 530 U.S. at 148–149, 120 S.Ct. at 2109.

It is now settled in the Second Circuit that "after *Reeves*, a court may, in appropriate circumstances, still grant a defendant's motion for summary judgment ... when a plaintiff has offered only a *prima facie* case along with evidence that the defendant's stated nondiscriminatory reasons for an adverse employment action are pretextual." *Schnabel*, 232 F.3d 83 (affirming district court decision granting employer summary judgment in ADEA case). Such a determination requires "a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Schnabel*, 232 F.3d at 90 (quoting *Reeves*, 120 S.Ct. at 2106); *see also Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 380 (2d Cir.2001) ("[t]he task ... is to examine the entire record and, in accordance with *Reeves*, make the case-specific assessment as to whether a finding of discrimination may reasonably be made"). In other words, an employer that has put forth a nondiscriminatory reason for its employment action is entitled to summary judgment "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir.2000).

Calling *Reeves* its "principal guide on these questions," the Second Circuit has observed that "[o]ur circuit has not read *Reeves* [as] favorably to Title VII plaintiffs" as some other Courts of Appeals. *Zimmermann*, 251 F.3d at 380. The Court of Appeals has ruled "in several cases that a record that included evidence of a *prima facie* case and evidence permitting a finding of pretext did not suffice to permit a finding of discrimination." *Id.* (citing *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 93–94 (2d Cir.2001); *James v. New York Racing Ass'n*, 233 F.3d at 157; *Schnabel*, 232 F.3d at 91).

The proof relied on by plaintiffs to demonstrate that RCSD's actions were discriminatorily motivated are so weak as to be virtually nonexistent. These references do not relate directly to incidents surrounding either Seils or Vreeland, but relate to matters occurring in other places, at other times, sometimes years previously and involving matters wholly unrelated to

the claims at issue here. For example, plaintiffs rely extensively on vague assertions that former Franklin principal Clark Powell slept while at work or was rude to other school personnel, or mishandled a rash of incidents involving false fire alarms. They offer additional, albeit irrelevant, evidence that Powell had difficulties at prior assignments in Maryland. It cannot be disputed that such evidence has no bearing whatsoever on plaintiffs' individual claims of race discrimination. Plaintiffs' myriad other claims are equally unavailing.

Throughout their papers, plaintiffs make repeated references to the fact that they allege certain forms of discrimination. *See e.g.*, Seils' Memorandum of Law, Dkt. # 211, p. 22 ("Mr. Seils and Mrs. Vreeland have alleged and can prove . . . ."); p. 23 ("Mr. Seils and Mrs. Vreeland allege and have proof . . . ."); p. 25 ( "each plaintiff has alleged . . . ."). Yet, neither Seils nor Vreeland ever specifically delineate any of the proof they purportedly have. As previously stated, plaintiffs may no longer rest on their allegations at this juncture. Because they have failed to shepherd the requisite proof in support of any of their claims, all such claims must succumb to defendants' summary judgment motion.[11]

11. Plaintiffs also contend that defendants' summary judgment motion is premature because plaintiffs have been denied certain discovery. The remote possibility that discovery *may* uncover evidence that supports their claims does not preclude the granting of the RCSD defendants' motion. I note initially that plaintiffs failed to submit any affidavit, as required by FED. R. CIV. P. 56(f). *See Gurary v. Winehouse*, 190 F.3d 37, 43–44 (2d Cir. 1999) ("the failure to file such an affidavit is fatal to [such] a claim . . . even if the party resisting the motion for summary judgment alluded to a claimed need for discovery in a memorandum of law"); *accord Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137 (2d Cir.1994) (holding that a reference to Rule 56(f) and to the need for discovery in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit, and "the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate"). Furthermore, other than alluding to their prior motion to compel seeking, *inter alia*, "all available evidence about the employment scene" (which was denied by Magistrate Judge William Bauer, Dkt. # 174), or to evidence purportedly gathered in another case (*Murphy v. Board of Education*, 00–CV–6038), plaintiffs have not offered any specifics regarding the nature of the requested discovery, or how the facts sought are reasonably expected to create a genuine issue of material fact. In light of the voluminous material submitted in this motion, it seems remarkable that plaintiffs would claim that they lack any information.

Notwithstanding the fact that plaintiffs have failed to meet the requirements of Rule 56(f), I have reviewed the discovery requests referenced in their prior motion. (Dkt.# 132). Many of those requests appear remarkably broad and seek irrelevant information. Illustrative of plaintiffs' overly broad requests, for example, are their 42 deposition notices, requests for the entire personnel files of 62 individuals, requests for the records and files of 29 students, requests for medical, arrest, and conviction information about a former principal, requests regarding incidents that purportedly occurred decades ago, requests for documents regarding the sexual histories of individuals, and requests regarding the alleged teaching of religion. It is not at all apparent how plaintiffs' myriad farfetched requests would lead to any relevant evidence in this case.

In light of the nature of the requests, it is perhaps understandable why plaintiffs have not delineated in a Rule 56(f) affidavit specifically how such discovery might lead to admissible evidence which would create a genuine issue of material fact in this case. To the contrary, requests similar to these were made by plaintiffs' counsel on behalf of another individual suing RCSD in another case, and the federal magistrate judge who reviewed them soundly rejected such overly broad attempts at discovery. *See* Decision and Order of Magistrate Judge Jonathan Feldman, entered in *Murphy v. Board of Education*, 00–CV–6038 (W.D.N.Y. September 12, 2000) (Dkt.# 83) (chastising "plaintiff's unwillingness to focus his pretrial discovery on relevant issues and requests," and noting that

I find that plaintiffs have not demonstrated any pretextual reasons that were intended to mask race discrimination. For all of the reasons stated in this decision, I find that plaintiffs have presented no evidence upon which a reasonable trier of fact could base the conclusion that their race was a determinative factor in RCSD's decision to discipline Seils or to discipline those about whom Vreeland complained. Therefore, plaintiffs cannot meet what the *Reeves* Court reaffirmed was their "ultimate burden." *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106 (internal quotation marks omitted). Summary judgment in the RCSD defendants' favor is warranted on the race claims.

## C. The Sex, National Origin, and Disability Discrimination Claims

Both plaintiffs have also alleged discrimination on the basis of national origin and disability, and Seils has alleged sex discrimination, in their prolix amended complaint. This is yet another example of plaintiffs' overreaching. Although pleaded with vigor, the claims of sex, national origin and disability discrimination are not supported by any evidence. Neither plaintiff has presented proof, or even serious argument, to support claims that the actions taken were occasioned by their disability, gender or national origin. In all of the voluminous submissions by plaintiffs, there is no evidence proffered that either plaintiff was disabled, or perceived as such, or that either was treated in any disparate manner based upon their national origin. In fact, despite the passage of well over three years since the commencement of this lawsuit, plaintiffs have never even articulated their alleged disability or their national origin. All such frivolous claims must be dismissed, because they failed to raise them in their EEOC charges, or proffer any admissible evidence in support of them. It is remarkable, and indeed troubling, that plaintiff's counsel would plead such claims, offer no proof to support them and now oppose defendants' motion for summary judgment on those claims.

## D. Vreeland's Hostile Environment Claims

Many of Vreeland's hostile environment claims must be dismissed for the procedur-

"[p]laintiff seems bent on inviting acrimony, hostility and ultimately, litigation by serving discovery demands so impermissibly broad and far-reaching that legitimate demands for relevant information and documents get lost in the morass of inappropriate and irrelevant requests," and further noting: "This is a lawsuit, not a mud-fight. The Court firmly rejects as deplorable the notion that a litigant can delve without restriction or restraint into the most private and personal aspects of an individual's life simply by designating the individual as a 'defendant' in a discrimination lawsuit").

Moreover, a court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered. *See Gray v. Town of Darien*, 927 F.2d 69, 74 (2d Cir.) ("In a summary judgment context, an 'opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of [a summary judgment] motion' ") (quoting *Contemporary Mission, Inc. v. United States Postal Serv.*, 648 F.2d 97, 107 (2d Cir.1981)), *cert. denied*, 502 U.S. 856, 112 S.Ct. 170, 116 L.Ed.2d 133 (1991); *Capital Imaging Assoc. v. Mohawk Valley Medical Assoc.*, 725 F.Supp. 669, 680 (N.D.N.Y.1989) (citing *Waldron v. Cities Serv. Co.*, 361 F.2d 671, 673 (2d Cir. 1966)) (citations omitted) (While "Rule 56(f) discovery is specifically designed to enable a plaintiff to fill material evidentiary gaps in its case ... it does not permit a plaintiff to engage in a 'fishing expedition' "), *aff'd*, 996 F.2d 537 (2d Cir.), *cert. denied*, 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). For all of these reasons, I reject plaintiffs' request for yet another opportunity to supplement their papers.

al infirmities discussed above. But, even if I were to reach the merits of Vreeland's discrimination claims, I would still find that she has failed to raise a *prima facie* case against the RCSD defendants based on a hostile environment against Caucasians. Although Vreeland fails to articulate clearly in her complaint the precise basis for her claims, she alleges in response to the instant motion a hostile work environment claim based upon the alleged harassment by RCSD students and their parents against white employees and the failure of the RCSD defendants to do anything about it.

■ "When the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotations omitted). In order to prevail on a hostile work environment claim, a plaintiff must show both "(1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his employment and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Shabat v. Billotti,* 108 F.3d 1370, 1997 WL 138836, *1 (2nd Cir. 1997) (unpublished opinion).

■ But for RCSD itself, the vast majority of the RCSD defendants, however, never were Vreeland's employer, and plaintiff has cited no authority supporting the notion that they may also be liable for a hostile work environment claim. Moreover, plaintiffs have failed to shepherd the requisite evidence to overcome RCSD's motion. Vreeland has simply not shown that any of the actions perpetrated by her students or their parents occurred because Vreeland was Caucasian. RCSD's expla-

nation that Vreeland was treated the way she was because Vreeland was a teacher, and not because she was of any particular ethnic background is not so unreasonable that Vreeland's assertion of pretext will defeat defendants' summary judgment motion. Therefore, Vreeland's claims would be dismissed even absent their procedural infirmities.

### E. The Pattern and Practice Claims

■ Plaintiffs sprinkle the amended complaint with the conclusory allegation that RCSD [and the other defendants] engaged in a pattern and practice of discrimination. Plaintiffs have done little else though to advance such a claim against the RCSD defendants.

First of all, the amended complaint does not contain a separate cause of action alleging that RCSD (or any other defendant) engaged in a pattern of discrimination. In any event, if plaintiffs intend to defeat the RCSD defendants' motions for summary judgment based on evidence of a pattern of discrimination, they have failed to produce sufficient, admissible, relevant evidence to do so. The record is such that no reasonable juror could find that such a pattern existed as to the RCSD defendants.

■ "[T]o make out a pattern or practice case, a plaintiff must show systematic disparate treatment—that is, that intentional ... discrimination is the standard operating procedure of the defendant, not merely that there have been isolated, sporadic acts of disparate treatment." *Lopez v. Metropolitan Life Ins. Co.*, 930 F.2d 157, 160 (2d Cir.), *cert. denied,* 502 U.S. 880, 112 S.Ct. 228, 116 L.Ed.2d 185 (1991); *see International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Given the need to prove such pervasive, systematic discrimination, the standard of proof

for a pattern or practice claim is higher than for a generic disparate treatment claim. Isolated instances of discrimination will not suffice. *See, e.g., Teamsters,* 431 U.S. at 336, 97 S.Ct. 1843; *Ste. Marie v. Eastern Railroad Assoc.,* 650 F.2d 395, 405–406 (2d Cir.1981). Even if a *Teamsters* analysis could ever be appropriate for individual cases (although plaintiffs have belatedly requested it, this case has not been certified as a class action), the evidence adduced in opposition to the RCSD defendants' motion does not present a genuine issue concerning whether they ever engaged in a pattern or practice of discrimination against older Caucasians.

■ Perhaps, the most glaring flaw is plaintiffs' reliance on purely anecdotal evidence. They offer no statistical evidence whatsoever against the RCSD defendants. In general, "a pattern or practice of disparate treatment is shown through a combination of 'statistical evidence demonstrating substantial disparities ... buttressed by evidence of general policies or specific instances of discrimination.'" *E.E.O.C. v. Chicago Miniature Lamp Works,* 947 F.2d 292, 299 (7th Cir.1991) (quoting *Coates v. Johnson & Johnson,* 756 F.2d 524, 532 (7th Cir.1985)). Plaintiffs' inability to assemble statistical evidence in support of their position is understandable, given that they claim a school district whose membership is largely Caucasian is discriminating against members of its own race. So too, the conclusory allegations regarding the individual plaintiffs or others are insufficient to create a factual issue as to whether the RCSD defendants engaged in a pattern or practice of discrimination. *See Coral Constr. Co. v. King County,* 941 F.2d 910, 919 (9th Cir.1991), *cert. denied,* 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992) (observing that "[w]hile anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination ...").

In sum, to the extent that plaintiffs are attempting to pursue a pattern or practice theory against the RCSD defendants, all such claims must be dismissed.

## F. The Retaliation Claims

■ Absent direct proof, "[t]he order and allocation of burdens of proof in retaliation cases follow that of general disparate treatment analysis as set forth in *McDonnell Douglas Corp. v. Green...*" *Sumner v. U.S. Postal Service,* 899 F.2d 203, 208 (2d Cir.1990) (citations omitted). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show (1) "protected participation or opposition under Title VII known by the alleged retaliator," (2) "an employment action disadvantaging the person engaged in the protected activity," and (3) "a causal connection between the protected activity and the disadvantageous employment action." *DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir.1987), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995).

■ With respect to Seils, the protected activity of filing a charge with the EEOC did not occur until *after* the allegedly improper conduct occurred (*i.e.,* when RCSD disciplined Seils for his role in the altercation). As a result, drawing all factual inferences in plaintiff's favor, I do not find that plaintiff has satisfied either the first or third prongs of the *prima facie* analysis. In other words, Seils has neither established any protected activity known by the RCSD defendants nor, *a fortiori,* has he established any causal connection between any protected activity and any disadvantageous employment action. Vreeland also failed to show the necessary nexus between any protected activity and any disadvantageous employment action.

## G. The New York HRL Claims

█ Plaintiffs' claims under New York Executive Law § 296 *et seq.* (Seils—7th cause of action; Vreeland—13th cause of action) must be dismissed as well. As the Second Circuit recently observed, "[w]e have frequently noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n. 1 (2d Cir.), *cert. denied*, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714–715 and 716, n. 6 (2d Cir.1996) (same); *Ramos v. City of New York*, 1997 WL 410493, *5 (S.D.N.Y.1997) (same). Plaintiffs' inability to establish a *prima facie* case under Title VII is equally fatal to their claims under state law. *Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F.Supp.2d at 267–268.[12]

## H. Plaintiffs' References to a Breach of the Duty of Fair Representation

In a vague manner, both Seils and Vreeland allege causes of action premised upon breach of contract (Seils—5th cause of action; Vreeland—11th cause of action). While, in response to this motion, plaintiffs have failed to elucidate on the precise nature of these obscure claims, they have heretofore made clear that they do not raise any claim for breach of a duty of fair representation. *See* Plaintiffs' Memorandum, p. 16, n. 8 (Dkt.# 38) ("Contrary to defense counsels' argument this is not a suit for breach of the duty of fair representation as such"). At oral argument of RTA's motion for summary judgment, plaintiffs' counsel again confirmed that plaintiffs are not pursuing any breach of the duty of fair representation claim.[13] Rather, they now maintain that theirs is simply a Title VII claim. *See id.* (asserting that this "is a discrimination/retaliation case in which breach of the duty of fair representation is part of the evidence").

Even if Seils and Vreeland did independently establish their *prima facie* cases of discrimination, their claims would fail to survive the instant motion because the RCSD defendants have offered legitimate, non-discriminatory reasons for their con-

---

**12.** While section 296(6) of the HRL, which provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so" N.Y. Exec. Law § 296(6), arguably may not be analogous to a provision in Title VII or the ADEA, plaintiffs have submitted nothing whatsoever in support of those broad claims. (Seils—9th cause of action; Vreeland—15th cause of action). Therefore, it should be dismissed as well.

**13.** If plaintiffs were attempting to pursue such a claim, RCSD correctly points out that these causes of action are time-barred by section 217(2)(b) of New York's Civil Practice Law and Rules ("CPLR"). Plaintiffs' claims accrued in 1996, when Seils' arbitration occurred and when Vreeland's order of protection was allegedly violated and her grievance concluded. It was in 1996, therefore, that RTA's alleged breach, if any, of its duty of fair representation occurred. Since this action was commenced more than four months from that date, any duty of fair representation claims would be time-barred. *See Langham v. New York*, 124 A.D.2d 405, 406, 507 N.Y.S.2d 766 (3d Dep't 1986), *appeal denied*, 69 N.Y.2d 605, 513 N.Y.S.2d 1026, 506 N.E.2d 537 (1987) (holding that CPLR § 217's limitation period begins to run when defendant's action has an impact on plaintiff). Moreover, with respect to Vreeland, it appears that she failed to exhaust the remedies available to her under the collective bargaining agreement. *Cf. King v. New York Tel. Co.*, 785 F.2d 31, 33 (2d Cir.1986) (before commencing suit for breach of a collective bargaining agreement, a bargaining unit member is required to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement).

duct. Neither Seils nor Vreeland has offered any admissible evidence demonstrating that the non-discriminatory reasons given by the RCSD defendants for their actions were pretextual. More fundamentally, the RCSD defendants had no involvement whatsoever with respect to who would represent Seils and his arbitration hearing.

## I. Claims Premised Upon 42 U.S.C. § 1983

To maintain a cause of action premised upon § 1983[14], a plaintiff "must allege conduct under color of state law that deprived him of rights secured by the Constitution or laws of the United States." *Katz v. Klehammer*, 902 F.2d 204, 206 (2d Cir.1990) (citation omitted). I agree with defendants that Seils' two day suspension without pay does not implicate a property interest of constitutional dimension. *See Larson v. Lynch*, 1998 WL 229919, *6, 1998 U.S. Dist. Lexis 21932, *18–19 (D.Conn. March 31, 1998) (holding that plaintiff may not maintain action for deprivation of property without due process premised upon a one-week suspension without pay); *Cybulski v. Cooper*, 891 F.Supp. 68, 71 (D.Conn.1995) ("plaintiff's property interest, if any, in his suspension is protected by the available post-deprivation remedy"); *Shub v. Hankin*, 869 F.Supp. 213, 216 (S.D.N.Y.1994) (questioning whether tenured public employee has property interest in personnel actions short of termination), *aff'd*, 66 F.3d 308 (2d Cir.1995).

Moreover, "complaints alleging § 1983 violations 'must contain specific allegations of fact. . . .; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983.'" *Humpherys v. Nager*, 962 F.Supp. 347 (E.D.N.Y.1997) (quoting *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir.1987)) (citations omitted). Because plaintiffs have offered nothing other than conclusory allegations, their claims premised upon § 1983 must be dismissed.

Even generously assuming that Seils had established a tangible property interest, there is no issue of material fact that RCSD afforded Seils all necessary process. For example, on the same day that Seils' altercation with the student occurred, an RCSD representative met with Seils and his union representative. Seils was given an opportunity to speak, and to hear the accounts of the student and the witnesses. Shortly thereafter, Seils was suspended with pay pending conclusion of the investigation. After Seils was informed that he would be suspended for two days without pay and required to attend a course, he filed a grievance. He was represented by counsel at the arbitration of that grievance. During the course of that arbitration, Seils had the opportunity to call and question witnesses and to testify himself. A neutral arbitrator issued a decision upholding the suspension. As a result, Seils not only received a pre-deprivation hearing at which he spoke, was represented, and heard the evidence against him, but he also received an extensive post-deprivation hearing, presided over by an impartial arbitrator. In this way, he cannot be said to have been denied procedural due process. *See Montefusco v. Nassau County*, 39 F.Supp.2d 231, 239–40 (E.D.N.Y.1999) (suspended teacher accorded due process where he was interviewed prior to charges being brought, and, following suspension, was granted hearing where he was represented by counsel, could cross-examine and call witnesses, and present evidence).

---

14. The amended complaint raises claims premised upon § 1983 on behalf of a purported class (2nd cause of action), on behalf of Seils (8th cause of action), and on behalf of Vreeland (14th cause of action).

■ Any possible claims the plaintiffs were denied equal protection must be dismissed as well. Seils does not identify any similarly situated teachers who were not disciplined for striking a student in the presence of credible witnesses, and he has produced no evidence of any discriminatory or retaliatory motive against him. *See Brennan v. City of White Plains*, 67 F.Supp.2d 362, 371 (S.D.N.Y.1999) ("[l]ike Title VII claims, Section 1983 claims premised upon equal protection violations ultimately demand proof of purposeful discrimination").

■ With respect to the Board of Education and its individual numbers, "[i]t is beyond dispute that there is no cause of action for damages under 42 U.S.C. § 1983 for damages against a school board or its members in their official capacities." *Montefusco v. Nassau County*, 39 F.Supp.2d at 238.

For all of these reasons, plaintiffs' § 1983 claims must be dismissed.

## J. Claims Premised Upon The Civil Rights Act of 1871, 42 U.S.C. § 1985(3)

■ Seils alone asserts a claim under § 1985(3) (Seils –10th cause of action).[15]

To state such a claim, a plaintiff must allege: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the law; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087–1088 (2d Cir.1993).

■ In order to satisfy the second element of a § 1985(3) claim, "the conspiracy not only must have as its purpose the deprivation of 'equal protection of the laws, or of equal privileges and immunities under the laws,' but also be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *United Brotherhood of Carpenters & Joiners*, 463 U.S. at 829, 103 S.Ct. 3352 *(quoting Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)); *see*

---

15. 42 U.S.C. § 1985 is entitled "Conspiracy to interfere with civil rights" and § 3 provides:
(3) Depriving persons of rights or privileges
If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*also Graham v. Henderson,* 89 F.3d 75, 81 (2d Cir.1996). This animus requirement prevents § 1985(3) from being interpreted as providing a federal remedy for all tortious conspiracies that interfere with the rights of others. *See Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994). Moreover, a constitutional conspiracy claim "must be pled with some degree of particularity." *Temple of the Lost Sheep, Inc. v. Abrams,* 88–CV–3675, 1990 WL 156139 (E.D.N.Y. September 26, 1990), *aff'd,* 930 F.2d 178 (2d Cir.), *cert. denied,* 502 U.S. 866, 112 S.Ct. 193, 116 L.Ed.2d 153 (1991). In addition, § 1985(3) "creates no substantive rights, but merely 'provides a remedy for violation of the rights it designates.'" *Sherlock v. Montefiore Med. Ctr.,* 84 F.3d 522, 527 (2d Cir.1996) (quoting *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979)).

While in the past some support existed for the proposition that reverse racial discrimination is not actionable under § 1985(3) (*see Davis v. Halpern,* 768 F.Supp. 968, 983 (E.D.N.Y.1991) (describing as problematic a claim under § 1985(3) for reverse racial discrimination); *Marsh v. Bd. of Educ. of the City of Flint,* 581 F.Supp. 614, 617–18 (E.D.Mich.1984), *aff'd without opinion,* 762 F.2d 1009, 1985 WL 12809 (6th Cir.1985), *vacated on other grounds,* 476 U.S. 1137, 106 S.Ct. 2240, 90 L.Ed.2d 688 (1986) (holding that § 1985(3) does not apply to a claim of reverse racial discrimination)), in *Triad Assocs., Inc. v. Chicago Housing Auth.,* 892 F.2d 583 (7th Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990), the Seventh Circuit concluded that reverse racial discrimination against whites was actionable under § 1985(3). *Id.* at 593. In *Murphy v. Board of Education,* 93–CV–6158, this Court agreed with the reasoning of the Seventh Circuit, and ruled:

To say that § 1985(3) applies only to discrimination against blacks would give that legislation too narrow a focus. It would mean that § 1985(3) would be unavailable not only to whites but also other racial minorities. "[T]he fact that discrimination against whites [and other racial minorities] was not the primary concern of the 42d Congress in 1871 should not deprive whites from receiving the protections of § 1985(3) expressly granted to any person or class of persons." *Id.* (quotation omitted).

While § 1985(3) may apply to Caucasians, it does not apply in this case because plaintiffs have failed to marshal the requisite evidence in support of their conspiracy theory—a theory which appears to have few boundaries, and at times borders on paranoia. For example, plaintiffs have alleged not only the involvement of RCSD and RTA but even the police department of the City of Rochester, attorney Louis Kash who represented RCSD, attorney Jules Smith who represented RTA, and even possibly Arbitrator Miller who heard the arbitration of Seils' grievance. As I previously stated in ruling on RTA's motion for summary judgment, I am troubled by the sweeping nature of such serious allegations in light of the fact that plaintiffs have submitted no evidence to support them, especially in light of the strictures of Rule 11. FED. R. CIV. P. 11. Rather than proffer evidence, plaintiffs merely rest on their allegations. At this juncture, plaintiffs must do more than merely rely on their pleadings, and since they have not, their § 1985(3) claim must be dismissed as well.

**K. Individual Liability**

The Title VII, ADEA, and ADA claims against the scores of individuals who have been named as defendants must be dismissed for the following addi-

tional reasons. It is well-established that individuals may not be held personally liable under Title VII. *Wrighten v. Glowski,* 232 F.3d 119, 120 (2d Cir.2000); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 74–75 (2d Cir.2000); *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2d Cir.1995); *Tomka v. Seiler,* 66 F.3d 1295, 1313 (2d Cir.1995). The same is true under the ADEA and ADA. *See, e.g., Corr v. MTA Long Island Bus,* 199 F.3d 1321, 1999 WL 980960 (2d Cir.1999) (unpublished) (affirming summary judgment against plaintiff and holding that "there is no right of recovery against individual defendants under the ADA"); *Martin v. Chemical Bank,* 129 F.3d 114, 1997 WL 701359 (2nd Cir.1997) (unpublished) (holding that "individual supervisors may not be held personally liable under the ADEA"); *see also EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1279–80 (7th Cir.1995) (noting that ADA, Title VII, and ADEA statutes are very similar and that "[c]ourts routinely apply arguments regarding individual liability to all three statutes interchangeably"). Accordingly, plaintiffs' Title VII claims as well as their baseless ADEA and ADA claims against all individual defendants are dismissed.

Moreover, the weight of authority in this circuit also holds that individuals may not be named as defendants in discrimination suits in their official or representative capacities. *See, e.g., Horsford v. the Salvation Army,* 99–CV–5721, 2001 WL 1335005, *5–6 (S.D.N.Y. Oct.29, 2001); *Cooper v. Morgenthau,* 99–CV–11946, 2001 WL 868003, *3–4 (S.D.N.Y. July 31, 2001); *O'Gorman v. Holland,* 97–CV–842, 2000 WL 134514, *4 (S.D.N.Y. Feb.3, 2000); *Hallett v. New York State Department of Correctional Services,* 109 F.Supp.2d 190 (S.D.N.Y.2000) (granting motion to dismiss ADA claims against individual defendants in both their individual and official capacities); *Candelaria v. Cunningham,* 98–CV–

6273, 2000 WL 798636, *2 (S.D.N.Y. June 20, 2000) (holding that individuals may not be held liable under the ADA in either their individual or official capacities); *Seres v. Liberty Chevrolet, Inc.,* 98–CV–5999, 1999 WL 11779, *1 (S.D.N.Y. Jan.12, 1999) (dismissing Title VII and ADEA official capacity claims and noting that there is nothing to show that Congress intended to permit suits against individuals in their official capacity); *Ngwu v. Salvation Army,* 96–CV–58, 1999 WL 2873, *2 (S.D.N.Y. Jan.4, 1999) (dismissing Title VII claims against the individual director and supervisor in their official capacities); *Pemrick v. Stracher,* 67 F.Supp.2d 149, 168 & n. 15 (E.D.N.Y.1999); *Brooks v. Hevesi,* 95–CV–3209, 1998 WL 32712, *1 (S.D.N.Y. Jan.29, 1998) (defendant could not be held liable under Title VII in his official capacity); *Lane v. Maryhaven Center of Hope,* 944 F.Supp. 158, 162–63 (E.D.N.Y.1996); *but see Coraggio v. Time Inc.,* 94–CV–5429, 1995 WL 242047, *8 (S.D.N.Y. Apr.26, 1995) (holding that individuals could be sued in their official capacity under Title VII). Moreover, even if these individuals had been properly named in this action, summary judgment would be appropriate because, as stated herein, plaintiffs have not introduced evidence from which a reasonable jury could conclude that any of the defendants violated Title VII, the ADA, or the ADEA.

 In addition, to the extent that plaintiffs' complaint asserts claims against any individual defendants under the HRL (with the exception of defendant Melendez), such claims must also fail. The evidence before the court establishes that Melendez alone was the RCSD official who decided to discipline Seils. While plaintiffs named scores of RCSD individuals, that is insufficient to hold them personally liable. Indeed, it has long been settled that: "[a] corporate employee, though he has a title

as an officer and is the manager or supervisor of a corporate division, is not individually subject to suit with respect to discrimination ... under New York's Human Rights Law ... if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) (involving claims of age and sex discrimination). With respect to many of the individually named defendants, there is absolutely no evidence that they had the requisite ownership interest or power.

Plaintiffs further allege that "defendants have aided and abetted discrimination/retaliation." Amended Complaint, ¶¶ 111, 136, Dkt. # 18. Section 296(6) of the HRL states that "[it] shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." The New York Court of Appeals has not decided whether section 296(6) allows an employee to be held liable as an aider and abettor if he participates in the discriminatory conduct but does not have any power to do more than carry out personnel decisions made by others, and the Appellate Divisions of the New York Supreme Court are split on the issue. *See Hicks v. IBM*, 44 F.Supp.2d 593, 599 n. 3 (S.D.N.Y.1999) (noting that the holding of *Tomka* is a subject of controversy among the New York courts); *Gemerek v. Buffalo Sewer Auth.*, Civ. No. A.99–0879, 2001 WL 603694 at *2 (W.D.N.Y. May 23, 2001) (same); *see also Chamblee v. Harris & Harris, Inc.*, 154 F.Supp.2d 670, 676–677 (S.D.N.Y.2001) (noting split in state decisions). However, the issue need not be resolved, because plaintiffs have offered no evidence that any individually named defendant actually participated in discriminatory conduct.[16]

With respect to the section 1983 claims, plaintiffs have failed to demonstrate any concrete nexus between these individuals and plaintiffs, and little, if any, personal involvement. On the contrary, the evidence establishes that many of the defendants had no relation whatsoever to the plaintiffs. Clark Powell, for example, worked at Franklin. Yet, both Seils and Vreeland make claims against him, notwithstanding the fact that it was Vreeland (and not Seils) who worked at Franklin. With respect to many other individually named defendants, plaintiffs have offered no proof of what they are alleged to have done other than that they held a particular position at a particular time.

Accordingly, the discrimination claims against all defendants in their individual and official capacities are dismissed.

## L. Plaintiffs' Motions To Certify A Class

By motion filed October 29, 1999 (Dkt.# 49), plaintiffs moved to certify this action as a class action. By decision and order dated November 19, 1999 (Dkt.# 55), this Court noted plaintiffs' delay in moving for class certification, and stayed all issues related to the motion during the pendency of defendants' motions to dismiss or for summary judgment pursuant to Rules 12 or 56 of the Federal Rules of Civil Procedure. Notwithstanding this Court's order, plaintiffs again moved to certify the action as a class action. (Dkt. # s 128–130).

As I alluded in this Court's November 19, 1999 decision and order, plaintiffs' orig-

---

**16.** In any event, even assuming that plaintiffs' HRL claims somehow survived the instant motion, I decline to exercise supplemental jurisdiction because all of the federal claims have failed.

inal motion for class action status (Dkt.# 49)[17] is untimely in light of the proscription in Rule 23(d) of the Local Rules of Civil Procedure for this Court that such motion be made "[w]ithin 120 days after the filing of a pleading alleging a class action." Well over a year passed between the filing of plaintiffs' initial pleading alleging a class action and plaintiffs' motion for class certification. By virtue of Local Rule 23(g), plaintiffs' failure to move in a timely fashion is deemed an intentional abandonment and waiver of all class action allegations. Plaintiffs' subsequent motion for the same relief does not cure the fact that the request was untimely.

Moreover, plaintiffs have never demonstrated any entitlement to maintain this action on behalf of a class. To the contrary, by virtue of the very individual claims alleged by Seils and Vreeland, there is no commonality to any questions of law or fact and the unique claims of Seils and Vreeland are not typical of the claims of any purported class. *See* FED. R. CIV. P. 23(a).

In any event, there can be no class where there remain no plaintiffs. Because defendants have been awarded summary judgment, plaintiffs' motions to certify are, in all respects, denied.

## M. Plaintiffs' Cross–Motions to Amend

Although Rule 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires," a court may deny leave to amend where the amended pleading is considered futile. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994) ("[u]ndue delay and futility of the amendment, among other factors, are reasons to deny leave"); *Picotte v. Community Child Care Ctr.,* 901 F.Supp. 588, 596 (W.D.N.Y.1995) (leave to amend may be denied when the amended pleading is considered futile). "An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a motion to dismiss on some other basis." *McNally v. Yarnall,* 764 F.Supp. 853, 855 (S.D.N.Y.1991).

In the case at bar, the complaint has been amended once already. Moreover, a prior cross-motion to amend by plaintiffs in this case (Dkt.# 33) was denied, in part, because their cross-motion lacked any proposed amendment or even any detailed explanation of how any amendment would state a valid claim for relief. Once again, plaintiffs' present cross-motions to amend lack any proposed amendment or any detailed explanation of how any amendment would state a valid claim for relief. In fact, plaintiffs offer nothing more than the following on this issue: "Pursuant to Rule 15, should the court for any reason conclude that any allegation and/or claim is insufficiently pleaded, it should grant leave to amend." Affs. of Emmelyn Logan–Baldwin, Dkt. Nos. 190, 199, p. 38. Based upon that single sentence, it appears that plaintiffs expect this court to divine the amendments plaintiffs may seek and give instructions accordingly. That, of course, is not how a proper motion to amend is made. Most importantly, however, no possible amendment could cure the procedural and substantive defects discussed herein. This case has been pending for several years, and, presumably, plaintiffs have marshaled their most compelling proof on the issues before the Court. For these reasons, plaintiffs' cross-motions to amend

---

**17.** Although plaintiffs amended their complaint to allege for the first time that they sought to bring claims on behalf of a class on September 28, 1998, they did not move for class action status until more than one year later on October 29, 1999 (Dkt.# 49).

(Dkt. # s 186 and 196) are in all respects denied.

### N. Plaintiffs' Renewed Cross–Motions for Partial Summary Judgment and Injunctive Relief

This Court denied plaintiffs' motions for partial summary judgment and injunctive relief on August 3, 2000. Plaintiffs have advanced no new evidence in support of their renewed motions. Indeed, their present cross-motions are virtually identical to their prior motions that this Court previously denied. Plaintiffs' cross-motions for partial summary judgment and injunctive relief (Dkt. # s 186 and 196) are, therefore, denied.

### CONCLUSION[18]

The motions of the Rochester City School District for summary judgment (Dkt. # s 150 and 158) are granted, and the complaint and each and every one of plaintiffs' claims are dismissed with prejudice. Plaintiffs' motions to certify this action as a class action (Dkt. # s 128 and 49) are, in all respects, denied. Plaintiffs' cross-motions to modify or amend this Court's prior decisions, orders, and judgments (Dkt. # s 186 and 196) are, in all respects, denied. Plaintiffs' renewed cross-motions for partial summary judgment, injunctive relief, and to amend the complaint (*id.*) are, in all respects, denied.

---

**18.** I am dismayed that this simple two-plaintiff case, in which neither plaintiff was terminated, demoted, or denied a promotion, has been used as a forum for a vitriolic attack on an entire school district, its board, and scores of individuals. From their genesis, these proceedings have included claims that either had no evidentiary support or were raised in order to harass others. Because of the nature in which these proceedings have evolved, the sheer volume of the papers, and the often duplicative, obscure, or baseless motions (over 210 filings), I remind parties and their counsel of the strictures of Rule 11, and caution them that claims raised in federal court may not be "presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," and that the allegations and other factual contentions must have "evidentiary support." Fed.R.Civ.P. 11(b).

Plaintiffs' discovery-related cross-motions (*id.*) are denied as moot.

IT IS SO ORDERED.